**Filed: August 26, 2020**

F# 2017R00217

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ASANTE KWAKU BERKO,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**1:20-cr-00328**
**Judge Roslynn R. Mauskopf**
**Magistrate Judge Peggy Kuo**

I N D I C T M E N T

Cr. No. **1:20-cr-00328**
<u> </u>
(T. 18, U.S.C., §§ 2, 371, 981(a)(1)(C),
982(a)(1), 982(b), 1956(h), 1956(f) and
3551; T. 15, U.S.C., §§ 78dd-2 and
78ff(a); T. 31, U.S.C., §§ 5314, 5322(a)
and 5322(b); T. 21, U.S.C., § 853(p);
T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

      At all times relevant to this Indictment, unless otherwise indicated:

I.    <u>The Defendant</u>

      1.      The defendant ASANTE KWAKU BERKO was a dual citizen of the

United States and Ghana.   In or about between July 2014 and March 2017, BERKO was

employed as an Executive Director in the Investment Banking Division ("IBD") of

Subsidiary A of U.S. Financial Institution.[1]   In or about between December 2014 and

March 2017 (the "relevant time period"), BERKO was a member of the team at U.S.

Financial Institution that was responsible for securing and managing a deal between U.S.

Financial Institution's client, Turkish Energy Company, and the Government of the Republic

of Ghana (the "Republic of Ghana") to build a power plant in Ghana (the "Power Plant") and

to provide financing for the Power Plant.   BERKO was a "domestic concern" as that term is

---

[1]    The identities of all anonymized entities and individuals discussed herein are known
to the United States and the Grand Jury.

defined in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2 (h)(1)(A), and a "United States person" as that term is used and defined in the FCPA, Title 15, United States Code, Sections 78dd-1(g)(1), 78dd-1(g)(2), 78dd-2(i)(1) and 78dd-2(i)(2).   BERKO was also an "employee" and "agent" of an "issuer" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

II.   Relevant Entities and Individuals

    A.   U.S. Financial Institution

        2.   U.S. Financial Institution was a global investment banking, securities and investment management firm incorporated in Delaware and headquartered in New York, New York.   U.S. Financial Institution conducted its activities globally, primarily through various subsidiaries and affiliated entities, including Subsidiary A (collectively, "U.S. Financial Institution").   U.S. Financial Institution had a class of securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and was required to file reports with the U.S. Securities and Exchange Commission under the Exchange Act.   U.S. Financial Institution was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).

        3.   Subsidiary A of U.S. Financial Institution was a wholly-owned subsidiary of U.S. Financial Institution that was incorporated in the United Kingdom.

    B.   Other Relevant Entities

        4.   Turkish Energy Company was a Turkish power production company and a subsidiary of the Turkish Holding Company, both of which were clients of U.S. Financial Institution.   During the relevant time period, U.S. Financial Institution owned approximately 16 percent of the shares of Turkish Energy Company.   Turkish Energy

2

Company constructed and operated power production facilities in Turkey and on the African continent.

5.     Ghana Consulting Company 1 was incorporated under the laws of Ghana and based in Accra, Ghana.   It purportedly provided services in the Ghanaian energy and gas sector.   The co-conspirators used Ghana Consulting Company 1 to collect funds from Turkish Energy Company for bribes to Ghanaian officials and for payments to themselves.

6.     Ghana Consulting Company 2 was based in Ghana.  It was used by the co-conspirators to collect reimbursement from Turkish Energy Company for bribes paid by the defendant ASANTE KWAKU BERKO, Co-Conspirator 1, Co-Conspirator 4 and others to Ghanaian officials and to invoice Turkish Energy Company for payments due to Ghana Consulting Company 1.

C.     Other Relevant Individuals

7.     Co-Conspirator 1 was a Ghanaian national and director of Ghana Consulting Company 1 during the relevant time period.

8.     Co-Conspirator 2 was a Turkish national and a high-ranking officer at Turkish Energy Company during the relevant time period.

9.     Co-Conspirator 3 was a Turkish national and a high-ranking officer at Turkish Energy Company during the relevant time period.

10.     Co-Conspirator 4 was a Ghanaian national and a Legal Permanent Resident of the United States.   During the relevant time period, Co-Conspirator 4 was also a principal in Ghana Consulting Company 1 and Ghana Consulting Company 2.

D.     Foreign Officials

3

11.   Ghana Official 1 worked for, acted in an official capacity for, and acted on behalf of the Ghanaian Ministry of Power and was an advisor to a high-ranking official in the Ghanaian Ministry of Power ("Senior Ghana Official").   Ghana Official 1 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

12.   Ghana Official 2 was a high-ranking official who worked for, acted in an official capacity for, and acted on behalf of the Ghanaian Ministry of Power.   Ghana Official 2 was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

III.   The Criminal Scheme

  A.   Overview

13.   In or about and between December 2014 and March 2017, the defendant ASANTE KWAKU BERKO, with the intent to benefit himself and, at least in part, U.S. Financial Institution, among others, conspired with others to make corrupt payments to government officials in Ghana to obtain and retain business from the Republic of Ghana that would benefit the business interests of BERKO, U.S. Financial Institution, Turkish Energy Company and others.   BERKO and others also conspired to launder money in and through financial systems in the United States and elsewhere to promote their unlawful bribery scheme.   These laundered funds were used, among other ways, to pay bribes to obtain and retain business for BERKO, U.S. Financial Institution and Turkish Energy Company.

14.   During the relevant period, the defendant ASANTE KWAKU BERKO was a member of the team at U.S. Financial Institution that was responsible for securing and

4

managing a deal between U.S. Financial Institution's client, Turkish Energy Company and the Republic of Ghana to build and provide financing for the Power Plant.

15.     To build the Power Plant, Turkish Energy Company needed to secure a "power purchase agreement" or "emergency power agreement" ("PPA" or "EPA") with the Republic of Ghana.   Securing an EPA required approvals from certain Ghanaian officials and government entities, including, among other things, the approval and signature of the Senior Ghana Official, as well as executive, cabinet and parliamentary approval.   It also required approval from Ghana Grid Company Limited ("GridCo"), an entity wholly owned by the Republic of Ghana, and the Public Utilities Regulatory Commission ("Purc"), a Ghanaian regulatory body overseen by the President of Ghana.

16.     The defendant ASANTE KWAKU BERKO and his co-conspirators agreed that BERKO, Co-Conspirator 1, Co-Conspirator 4 and others would pay bribes to Ghanaian officials to obtain the necessary approvals for the Power Plant.

17.     The defendant ASANTE KWAKU BERKO and his co-conspirators further agreed to seek reimbursement for these bribes from Turkish Energy Company by issuing false invoices for "consultancy services" purportedly provided by Ghana Consulting Company 2, which were then paid by Turkish Energy Company or its parent, Turkish Holding Company, from bank accounts in Turkey to bank accounts in Ghana through the financial system of the United States.

18.     The defendant ASANTE KWAKU BERKO and his co-conspirators, including Co-Conspirator 1 and Co-Conspirator 4, also planned to obtain continuing payments from Turkish Energy Company after they assisted Turkish Energy Company with corruptly securing the EPA through a services contract between Ghana Consulting Company

5

1 and either Turkish Energy Company or Turkish Holding Company, which would be effectuated once the EPA had been secured.

19.    In furtherance of the scheme, the defendant ASANTE KWAKU BERKO and others caused more than $700,000 in bribes to be transferred to Ghana Official 1, Ghana Official 2 and other Ghanaian officials, including officials in the Ghanaian parliament, Purc and GridCo, corruptly in exchange for, among other things, their assistance in ensuring that Turkish Energy Company was successful in winning the bid to build and operate the Power Plant.

20.    The defendant ASANTE KWAKU BERKO and his co-conspirators sent and received emails and wire transferred money in furtherance of and with the intent to promote the bribery scheme, through correspondent banks that passed through the Eastern District of New York.

B.    Genesis of the Conspiracy

21.    While employed at U.S. Financial Institution, the defendant ASANTE KWAKU BERKO was tasked with obtaining business for U.S. Financial Institution.   As part of this employment, in or about late November 2014, BERKO, together with other employees of U.S. Financial Institution, began to explore the possibility that their client, Turkish Energy Company, would build the Power Plant.   BERKO and his colleagues expected such a deal would provide multiple business opportunities for U.S. Financial Institution; not only was U.S. Financial Institution a part owner of Turkish Energy Company, but U.S. Financial Institution planned to arrange financing related to the project, including a loan of approximately $190 million to Turkish Energy Company to build the Power Plant and a letter of credit ("LC") for the Republic of Ghana of approximately $75 million in

6

connection with the operation of the Power Plant, which was required to complete the deal. These business opportunities, if completed, would have resulted in significant fees for U.S. Financial Institution of approximately $10.3 million for the loan and over $1 million for the LC.

22.     On or about November 28, 2014, an employee of U.S. Financial Institution emailed the defendant ASANTE KWAKU BERKO to inform him of a meeting that the employee had with representatives of Turkish Energy Company regarding opportunities for Turkish Energy Company in Ghana.   In or about early December 2014, BERKO emailed that employee about the Republic of Ghana's interest in power generation and offered to set up a meeting between representatives of Turkish Energy Company and certain Ghanaian officials.

23.     The defendant ASANTE KWAKU BERKO and Co-Conspirator 1 agreed that Co-Conspirator 1, in his capacity as director of Ghana Consulting Company 1, would help arrange the meetings with the Ghanaian officials and, if the project proceeded, help obtain an EPA between Turkish Energy Company and the Republic of Ghana.   Emails obtained from U.S. Financial Institution show that BERKO and Co-Conspirator 1 understood that Co-Conspirator 1 would use Co-Conspirator 1's connections with certain Ghanaian officials and their relatives to accomplish this goal.

24.     In or about early December 2014, the defendant ASANTE KWAKU BERKO, other employees of U.S. Financial Institution and Co-Conspirator 1 made arrangements for representatives of Turkish Energy Company, including Co-Conspirator 2, to meet with certain senior Ghanaian officials in Ghana.   That meeting took place on or about December 18, 2014.

7

25.     In or about late December 2014, after the meeting in Ghana, the defendant ASANTE KWAKU BERKO worked with Co-Conspirator 1 and others to arrange for representatives of Turkish Energy Company to meet in Turkey with Co-Conspirator 4, the Senior Ghana Official, other senior Ghanaian officials and a relative of the President of Ghana (the "Presidential Relative"), who was also associated with Ghana Consulting Company 1, to discuss the Power Plant.

C.     Execution of the Criminal Scheme

26.     In or about early January 2015, the defendant ASANTE KWAKU BERKO, Co-Conspirator 4, an employee of U.S. Financial Institution, the Senior Ghana Official, other senior Ghanaian officials and the Presidential Relative traveled to Istanbul, Turkey, to meet with Co-Conspirator 2, Co-Conspirator 3 and other representatives of Turkish Energy Company.   After this meeting, Turkish Energy Company submitted a bid to the Republic of Ghana for an EPA to build the Power Plant.

27.     In addition to discussions with the Presidential Relative, Co-Conspirator 1 also communicated with Ghana Official 1 about Turkish Energy Company's EPA proposal.   On or about February 28, 2015, Ghana Official 1 emailed Co-Conspirator 1 about the Senior Ghana Official's response to Turkish Energy Company's EPA proposal. Later that day, Co-Conspirator 1 emailed Ghana Official 1 to set up a meeting to discuss the Senior Ghana Official's concerns.

28.     On or about March 11, 2015, Ghana Official 1 sent an email to several senior Ghanaian government officials, including the Senior Ghana Official, identifying members of the "Emergency Project Team," including Ghana Official 2.   The email specified that the members of the team would serve as representatives of their respective

government agencies and would be responsible for making sure their agencies carried out the tasks necessary to complete the deal for the Power Plant.

29.     In or about March 2015, the defendant ASANTE KWAKU BERKO, Co-Conspirator 1 and Co-Conspirator 3 discussed Ghana Consulting Company 1's compensation for securing the Power Plant deal with Turkish Energy Company.   Ultimately, the parties reached a tentative agreement that Ghana Consulting Company 1 would be compensated "from the variable," that is, with payments tied to the output of the Power Plant's ultimate operation.

30.     In or about April 2015, the defendant ASANTE KWAKU BERKO, Co-Conspirator 1 and Co-Conspirator 4 began circulating drafts of a contract between Turkish Energy Company and Ghana Consulting Company 1.   The initial drafts of the contract provided that Turkish Energy Company would pay Ghana Consulting Company 1 a variable yearly fee based on the fees payable to Turkish Energy Company under the EPA, but would not be less than $10 million in any year.   The draft contracts also provided that Turkish Energy Company would reimburse Ghana Consulting Company 1 for costs and expenses incurred in the provision of services under the contract, which included such services as "acting as chief liaison with [the Republic of Ghana] and state owned entities in negotiations" related to the EPA.   Financial models provided by Turkish Energy Company to U.S. Financial Institution in and around this time show Ghana Consulting Company 1 receiving approximately $9.7 million per year based on the projected kilowatt hours of energy produced by the Power Plant.   By in or about late May 2015, the draft contract also included a $5 million fee payable to Ghana Consulting Company 1 upon the execution of the EPA, and later discussions between BERKO and Co-Conspirator 4 indicate that negotiations

9

resulted in this fee being broken out into milestone payments to Ghana Consulting Company 1 for events including the agreement with the Republic of Ghana on the EPA, the signing of the EPA, the finalization of the LC and the commencement of plant operations.

31.     On or about April 13, 2015, the defendant ASANTE KWAKU BERKO emailed an employee of U.S. Financial Institution and others to advise them that Turkish Energy Company had reached an agreement with the Republic of Ghana on the EPA for the Power Plant.   BERKO stated that the "[t]arget is for [the Senior Ghana Official] to sign agreement next week" and indicated that he was headed to Ghana to "keep pushing."

32.     The next day, on or about April 14, 2015, Co-Conspirator 4 emailed the defendant ASANTE KWAKU BERKO and Co-Conspirator 1 an invoice for $500,000 from Ghana Consulting Company 2, which he referred to as "invoice 1" ("Invoice 1"). Invoice 1 was dated on or about April 14, 2015, contained the reference number "62043" and included bank routing instructions for a United States bank ("U.S. Bank 1") in New York, with a destination account at a Ghanaian bank ("Ghana Bank 1").   In the email attaching Invoice 1, Co-Conspirator 4 also referenced three future invoices of $1.5 million to be paid at upcoming milestones, including the signing of the EPA, the finalization of the LC and the start of operations at the Power Plant.

33.     Co-Conspirator 1 emailed Invoice 1 to Co-Conspirator 3 shortly after Co-Conspirator 1 received it.   In or about and between April 19, 2015 and April 20, 2015, Co-Conspirator 1, Co-Conspirator 3 and the defendant ASANTE KWAKU BERKO discussed Invoice 1 in a series of emails:

(a)     On or about April 19, 2015, Co-Conspirator 1 emailed Co-Conspirator 3 and BERKO and asked Co-Conspirator 3 to

10

"[k]indly arrange for the first 500k$ to be in Ghana this week. I'd advise you to send the same as directed to the relevant bank account.   The intended recipient is on my case.   Please make arrangements to have the 1.5m$ also here in Ghana no later than end of this week or early part of the following.   I am going to part with 250k$ to [Ghana Official 1] on the basis that I will receive the same in due course.   This will represent part payment to [Ghana Official 1] as discussed."

(b)    In a subsequent email sent on or about April 19, 2015, Co-Conspirator 1 emailed Co-Conspirator 3 and BERKO,

"Please proceed as I stated earlier.   It is in all our interest to make sure the necessaries are done now.   500 now!!!   Very urgent. . . . As I stated, I am getting concerned with [Ghana Official 1] and [Ghana Official 1's] resistance.   I've decided to sort [Ghana Official 1] out this week following recent developments and would advise that you have the same ready for me immediately upon signature."

(c)    On or about April 20, 2015, Co-Conspirator 3 emailed Co-Conspirator 1 and BERKO to inform them that "500 k is coming today or tomorrow" and directed Co-Conspirator 1 to "pay [Ghana Official 1]."   Co-Conspirator 3 also wrote that they should be prepared to sign the EPA that week.   On or about the same day, $500,000 was wire transferred from an account at a Turkish bank ("Turkey Bank 1") in Turkey held by Turkish Energy Company (the "Turkish Energy Company Account 1") to an account held by Ghana Consulting Company 2 at Ghana Bank 1 in Ghana (the "Ghana Consulting Company 2 Account") through correspondent bank accounts at U.S. Bank 1 in New York.   The correspondent wire record included the reference number for Invoice 1.

34.    On or about April 24, 2015, with the assistance of Ghana Official 1, a team of approximately five Republic of Ghana officials traveled to Turkey to inspect the equipment Turkish Energy Company proposed to use in the Power Plant.   The defendant

11

ASANTE KWAKU BERKO and Co-Conspirator 1, in agreement with their co-conspirators, covered the trip expenses for the five Republic of Ghana officials (including for flights and hotel rooms) and also paid each of them a $5,000 bribe.   Co-Conspirator 2 agreed to reimburse Co-Conspirator 1 and BERKO for part of these payments and expenses. Following the trip, the Republic of Ghana officials sent Ghana Official 1 a favorable assessment of the equipment, which Ghana Official 1 emailed to the Senior Ghana Official.

35.     In or about and between April 27, 2015 and May 2, 2015, the defendant ASANTE KWAKU BERKO, Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Ghana Official 1 and others worked to finalize the EPA between Turkish Energy Company and the Republic of Ghana.   On or about May 2, 2015, Co-Conspirator 3 emailed BERKO, Co-Conspirator 2 and other representatives of U.S. Financial Institution and Turkish Energy Company.   In that email, Co-Conspirator 3 complained about difficulties with Ghana Official 1, but noted his importance to the EPA process, stating that "[a]t the end of the day, we were told that [the Senior Ghana Official] will hesitate to sign if [the Senior Ghana Official] has a negative report from [Ghana Official 1]."

36.     The Senior Ghana Official signed the EPA on or about May 12, 2015. On the same date, Co-Conspirator 4 emailed Co-Conspirator 1 an invoice for $1.5 million from Ghana Consulting Company 2 that he referred to as "invoice 2" ("Invoice 2") and requested payment.   Invoice 2 was dated on or about May 12, 2015, contained the reference number "62052," was addressed to Turkish Energy Company and stated that the payment was "Per Consultancy Service Agreement."

37.     On or about May 15, 2015, Ghana Official 1 sent an email to Co-Conspirator 2 to thank him for his assistance.   Co-Conspirator 2 responded to Ghana

12

Official 1 to "express [his] gratitude to [Ghana Official 1] personally for the realization of [the] project not only until signature buit [sic] for the next steps as well," noting that Ghana Official 1's "continuous support is key to both our success." In response, Ghana Official 1 assured Co-Conspirator 2 of [Ghana Official 1's] "full support and cooperation."

38.    On or about May 19, 2015, Co-Conspirator 1 forwarded Invoice 2 to Co-Conspirator 2. Subsequently, on or about May 22, 2015, $1.5 million was wired from the Turkish Energy Company Account 1 to the Ghana Consulting Company 2 Account through correspondent bank accounts at U.S. Bank 1 in New York. The correspondent wire record included the reference number for Invoice 2.

39.    On or about June 11, 2015, $75,000 was wired from the account held by Ghana Consulting Company 2 to an account at a Ghanaian bank ("Ghana Bank 2") in the name of defendant ASANTE KWAKU BERKO (the "Berko Ghana Account 1"). On or about July 2, 2015, BERKO transferred approximately $50,000 from the Berko Ghana Account 1 to a bank account in BERKO's name at a United States bank ("U.S. Bank 2").

40.    On or about June 13, 2015, Ghana Official 1 sent an email to Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3 and others, complaining that Ghana Official 1 had not been kept in the loop and demanding a "weekly progress report" on the Power Plant.

41.    On or about July 17, 2015, the Ghanaian parliament ratified the EPA.

42.    In or about August 2015, the defendant ASANTE KWAKU BERKO, Co-Conspirator 1, Co-Conspirator 2 and Co-Conspirator 4 continued to negotiate the contract between Ghana Consulting Company 1 and Turkish Energy Company. Co-Conspirator 1 rejected a counteroffer from Co-Conspirator 2 to pay Ghana Consulting Company 1 $25

million, and the parties ultimately agreed to meet in London on or about August 15, 2015 to

discuss the contract.   Following that meeting, the parties agreed on a version of the contract

that provided for total fees to Ghana Consulting Company 1 of $42 million in milestone and

periodic payments, eliminating the variable component that the parties had originally

discussed.   The final contract was executed by Turkish Holding Company and Ghana

Consulting Company 1 on or about September 29, 2015.

   43. On or about August 10, 2015, the Republic of Ghana and Turkish

Energy Company signed the EPA for Turkish Energy Company to construct the Power Plant

and operate it for five years.   On or about that same date, Co-Conspirator 1 sent Ghana

Official 1 U.S. Financial Institution's proposal for the LC.

   44. On or about August 17, 2015, Co-Conspirator 1 forwarded an August

4, 2015 email to Co-Conspirator 2 requesting payment of $250,000 in reimbursement for

bribes previously paid to Ghanaian officials.   Pursuant to the defendant ASANTE KWAKU

BERKO's instruction, Co-Conspirator 1 copied BERKO at his personal account on that

email, rather than his business account at U.S. Financial Institution.   Co-Conspirator 2 asked

for "details of the request," which Co-Conspirator 1 provided in an email on August 28,

2015:

   As requested by [Co-Conspirator 2], please find breakdown of
   funds·

| | |
|---|---|
| Visas | 5000 |
| Purc | 20000 |
| [Ghanaian Official 2] | 10000 |

| MoP Girls[2] | 20000 |
| Power Team | 25000 |
| Gridco Eng. | 20000 |
| Travel to Turkey | 45000 |
| Parliament | 30000 |
| Asante personal | 35000 |

These are the substantial payments made.   Kindly perform your magic.

45.    In a reply email, Co-Conspirator 2 responded that Co-Conspirator 2 would not pay the full $250,000 requested, but that Co-Conspirator 2 was willing to pay "105k."   Co-Conspirator 1 then replied, again copying the defendant ASANTE KWAKU BERKO at his personal email account:

Are you suggesting that we split the cost incurred? I don't understand your acceptances and rejections otherwise.

Purc have so far received 120k.   100k from u and 20k from Asante.

Each inspector that visited Turkey was given 5k on top of their Flight and accommodation.   Total expenditure was just over 45k.

The MoP girls have been promised 30k in total...   That's 10k each when we get to LC. They have received 20k so far. These ladies are most vital to our communication and information acquisition. They still have 10k to go ....

Parliament was all paid by Asante.   He actually added another 10k on his last visit as he had promised this to the guys.   The whole 30k requested is due him.  I know he paid more than that. (Approximately 46k that I know of!)

The powerteam were very receptive after I started agreeing payments with them.   The payments were staggered and settled

---

[2] "MoP" refers to the Ministry of Power.

fully when we had a contract agreed.   They were 8 in all...
Average payment was only 3k!   The important ones like ECG
and MoP received 5k.

Gridco.... The number of times we have visited them and the
number of engineers we have interacted with!!   Each time they
were sorted out to make sure we got the correct information and
assistance.   Why would you even think 5k?....

46.     On or about September 2, 2015, Co-Conspirator 2 replied to Co-Conspirator 1's email, again copying the defendant ASANTE KWAKU BERKO at his personal email account.   Co-Conspirator 2 agreed to settle the dispute by paying what BERKO had agreed to pay, which ultimately amounted to $140,000.

47.     On or about September 4, 2015, $140,000 was wire transferred from an account at a Turkish bank ("Turkey Bank 2") held by Turkish Energy Company (the "Turkish Energy Company Account 2") to an account at a Ghanaian bank ("Ghana Bank 3") in Ghana, in the name of Ghana Consulting Company Employee (the "Consulting Company Employee Account").   These funds were transmitted through correspondent bank accounts in New York, New York.

48.     Subsequently, on or about September 10, 2015, email correspondence showed that $99,900 was wired from an account in the name of Ghana Consulting Company Employee at to a different account in the defendant ASANTE KWAKU BERKO's name at Ghana Bank 2 (the "Berko Ghana Account 2").

49.     By in or about June 2015, bankers at U.S. Financial Institution began to question Turkish Energy Company about the payments to Ghana Consulting Company 1 that appeared in their financial models.   In an email, Co-Conspirator 3 told the bankers at U.S. Financial Institution that Ghana Consulting Company 1 was Turkish Energy Company's

16

"local partner," but that Ghana Consulting Company 1's only tangible contribution was helping with "local arrangements; i.e. housing, security, advisory on permitting, or other local goods and services...."

50.     Between in or about late 2015 and early 2016, U.S. Financial Institution conducted a due diligence review of the Power Plant deal and became aware that Turkish Energy Company had paid Ghana Consulting Company 1 for services and that the defendant ASANTE KWAKU BERKO had been communicating with Co-Conspirator 1. Specifically, as part of its due diligence, U.S. Financial Institution conducted an email review of, among other accounts, the defendant ASANTE KWAKU BERKO's email account at U.S. Financial Institution.   That review identified Ghana Consulting Company 1 and numerous email communications between BERKO, Co-Conspirator 1, various Ghanaian officials and Ghana Consulting Company 1 employees using their personal email accounts.

51.     On or about February 25, 2016, $200,000 was transferred from the Turkish Energy Company Account 1 to the Consulting Company Employee Account.   On or about March 4, 2016, Ghana Consulting Company Employee wired $194,000 from an account in Ghana Consulting Company Employee's name to the Berko Ghana Account 2.

52.     In or about May 2016, compliance employees of U.S. Financial Institution requested specific information regarding the services Ghana Consulting Company 1 had provided to Turkish Energy Company, as well as the role Ghana Consulting Company 1 had played in the deal.   Co-Conspirator 2 and Co-Conspirator 3 responded that Ghana Consulting Company 1 helped with "local services" such as securing visas and car rentals. Co-Conspirator 2 stated that Ghana Consulting Company 1 had been paid $300,000 prior to May 2016 for such services and would be compensated approximately $200,000 to $300,000

17

before its services were terminated in 2016.   The defendant ASANTE KWAKU BERKO
was copied on these emails, and he and Co-Conspirator 2 knew at the time that this
information was false.   BERKO, however, did not advise U.S. Financial Institution that the
information was false.   The emails made no mention of the $42 million contract with Ghana
Consulting Company 1 or the hundreds of thousands of dollars in bribes already paid by the
co-conspirators using Ghana Consulting Company 1 and Ghana Consulting Company 2 as
cover.   When pressed for further information by employees of U.S. Financial Institution,
Co-Conspirator 2 responded in an email, "Sorry[.] We don't have time for this...."

       53.     On or about September 8, 2016, Turkish Holding Company transferred
$1 million to Ghana Consulting Company 1.   Following this payment, Co-Conspirator 1
drafted an email to Co-Conspirator 2 thanking him for the payment of $1 million per Ghana
Consulting Company 1's "invoice dated 11th July 2016 relating to the Service Agreement
signed between [Turkish Holding Company and Ghana Consulting Company 1]".   In the
same email, however, Co-Conspirator 1 noted that a $2 million invoice, also dated July 11,
2016, was still outstanding.   Co-Conspirator 1 sent this draft email to Co-Conspirator 4 and
the Presidential Relative.

       54.     In or about and between September 28, 2016 and December 20, 2016,
Turkish Energy Company transferred $1.5 million to the Berko Ghana Account 1.

       55.     U.S. Financial Institution ultimately did not provide financing to
Turkish Energy Company or the Republic of Ghana in connection with the Power Plant.

       56.     The defendant ASANTE KWAKU BERKO gave notice to U.S.
Financial Institution of his intent to leave in or about December 2016, and his employment
with U.S. Financial Institution terminated on or about March 6, 2017.

57.     On or about February 14, 2017, an additional $500,000 was transferred from the Turkish Energy Company Account 1 to the Berko Ghana Account 1.

58.     The Power Plant reached operational completion in or about 2017.

IV.     Failure to Report Foreign Bank Accounts

59.     The Bank Secrecy Act, by regulation of the Secretary of the Treasury, required all U.S. persons, including U.S. citizens and resident aliens, to report to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") any financial interest in or signatory or other authority over any and all bank or other financial accounts held in foreign countries if the aggregate value of all such accounts exceeded $10,000 at any point during the calendar year, using FinCEN Form 114 (formerly TD F 90.22-1), Report of Foreign Bank and Financial Accounts. 31 U.S.C. § 5314 and 31 C.F.R. § 1010.350.

60.     FBAR filing instructions specifically provided that "any person who willfully fails to report an account or account identifying information may be … subject to criminal penalties under 31 U.S.C. section 5322(a), 31 U.S.C. section 5322(b), or 18 U.S.C. section 1001." The FBAR form itself further specified that the principal purpose of the form was for use in "criminal, tax or regulatory investigations or proceedings," and that penalties, including imprisonment for not more than five years, were provided by law for failure to file the report, for failure to supply information and for filing a false and fraudulent report.

61.     The defendant ASANTE KWAKU BERKO filed an FBAR for calendar year 2014 on or about June 26, 2015 (the "CY 2014 FBAR") with FinCEN. The CY 2014 FBAR listed two foreign bank accounts, both located in Great Britain.

62.     The deadline for filing an FBAR for the calendar year 2015 was June 30, 2016.   The deadline for filing an FBAR for the calendar year 2016 was April 18, 2017. The deadline for filing an FBAR for the calendar year 2017 was April 15, 2018.   The defendant ASANTE KWAKU BERKO failed to file an FBAR for the calendar years 2015, 2016 and 2017 disclosing his ownership of the Berko Ghana Account 1, despite the fact that the Berko Ghana Account 1 had an aggregate of more than $10,000 during each of those calendar years.

<u>COUNT ONE</u>
(Conspiracy to Violate the Foreign Corrupt Practices Act)

63.     The allegations contained in paragraphs one through 58 are realleged and incorporated as if fully set forth in this paragraph.

64.     In or about and between December 2014 and March 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ASANATE KWAKU BERKO, together with others, did knowingly and willfully conspire to commit offenses against the United States, namely:

(a)     being an employee and agent of an issuer, to corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation

of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist U.S. Financial Institution and others in obtaining and retaining business, for and with, and directing business to, BERKO, Turkish Energy Company, U.S. Financial Institution, and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-1, 78ff(a) and 78ff(c)(2)(a); and

(b)     being a domestic concern, to corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist BERKO and others in obtaining and retaining business for and with, and directing business to, BERKO, Turkish Energy Company, U.S. Financial Institution and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-2 and 78ff(a); and

(c)     being a United States person, to corruptly do acts outside the

21

United States in furtherance of an offer, payment, promise to pay, and authorization of the

payment of any money, offer, gift, promise to give, and authorization of the giving of

anything of value, to one or more foreign officials, and to one or more persons, while

knowing that all or a portion of such money and thing of value would be and had been

offered, given, and promised, directly or indirectly, to one or more foreign officials, for

purposes of: (i) influencing acts and decisions of such foreign official in his or her official

capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the

lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such

foreign official to use his or her influence with a foreign government and agencies and

instrumentalities thereof to affect and influence acts and decisions of such government and

agencies and instrumentalities, in order to assist BERKO and others in obtaining and

retaining business for and with, and directing business to, BERKO, Turkish Energy

Company, U.S. Financial Institution and others, contrary to the FCPA, Title 15, United

States Code, Sections 78dd-1(g) and 78dd-2(i).

65.    In furtherance of the conspiracy and to affect its objects, within the

Eastern District of New York and elsewhere, the defendant ASANTE KWAKU BERKO,

together with others, did commit and caused the commission of, among others, the following:

## OVERT ACTS

(a)    On or about April 20, 2015, Turkish Energy Company wired

$500,000 from the Turkish Energy Company Account 1 to the Ghana Consulting Company 2

Account using U.S. Bank 1 as its correspondent bank.   The correspondent wire record

included the reference number for Invoice 1.

22

(b)     On or about July 20, 2015, Co-Conspirator 4 sent an email to BERKO and Co-Conspirator 1, which, in sum and substance, discussed "next steps" in the deal negotiations with Turkish Energy Company and the reimbursement of bribes paid so far on the deal.

(c)     On or about July 20, 2015, BERKO, who was in New York at the time, sent a response email to Co-Conspirator 1 and Co-Conspirator 4, which, in sum and substance, discussed communications with Ghana Official 1 regarding the LC and further payments Turkish Energy Company needed to make to Ghana Consulting Company 1.

(d)     On or about August 4, 2015, Co-Conspirator 1 sent an email to Co-Conspirator 2 in which Co-Conspirator 1 provided an account number for the Consulting Company Employee Account to receive the "expected $250,000.00." In the email, Co-Conspirator 1 told Co-Conspirator 2 that "[Ghana Official 1] is also waiting for the 'holy rain' and would appreciate it sooner rather than later."

(e)     Also, on or about August 4, 2015, Co-Conspirator 1 forwarded the email described above to BERKO, writing "FYI." In response to the forwarded email, BERKO instructed Co-Conspirator 1 to "[r]eply and copy me in saying adding Asante. Gmail only!"

(f)     On or about September 2, 2015, BERKO replied to an email between Co-Conspirator 1 and Co-Conspirator 2 regarding reimbursement for the bribes previously promised or paid by BERKO, Co-Conspirator 1 and Co-Conspirator 4 to Ghanaian officials in Purc, the Ministry of Power, and the Ghanaian parliament, among others, saying "[a]s per email correspondence. Anywhere between 150 to 200 to settle and close the matter."

(g)     Also on or about September 2, 2015, Co-Conspirator 2 sent an email to BERKO and Co-Conspirator 1 agreeing to pay $140,000 to reimburse bribes that were previously promised or paid, saying "[w]e can follow 105 additionally 35 my two brothers in this case I am ready to settle@140," and BERKO responded to both, "[m]atter settled."

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Foreign Corrupt Practices Act)

66.     The allegations contained in paragraphs one through 58 are realleged and incorporated as if fully set forth in this paragraph.

67.     On or about September 4, 2015, within the Eastern District of New York and elsewhere, the defendant ASANATE KWAKU BERKO, being a domestic concern, did willfully use and cause to be used and aid and abet the use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and

24

agencies and instrumentalities, in order to assist BERKO and others in obtaining and retaining business for and with, and directing business to, BERKO, Turkish Energy Company, U.S. Financial Institution and others, to wit: a wire transfer in the amount of $140,000 from Turkish Energy Company Account 2 to Consulting Company Employee Account that was processed through a correspondent bank account in New York, New York.

(Title 15, United States Code, Sections 78dd-2 and 78ff(a); Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT THREE
### (Conspiracy to Commit Money Laundering)

68.     The allegations in paragraphs one through 58 are repeated and realleged as if fully set forth herein.

69.     In or about and between December 2014 and March 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ASANTE KWAKU BERKO, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-l, 78dd-2 and 78ff(a), contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h), 1956(f) and 3551 et seq.)

## COUNTS FOUR THROUGH SIX
### (Willful Failure to File Reports of Foreign Bank and Financial Accounts)

70.    The allegations in paragraphs one through 62 are repeated and realleged as if fully set forth herein.

71.    On or before the dates indicated in the table below, within the Eastern District of New York and elsewhere, the defendant ASANTE KWAKU BERKO, a citizen of the United States, did knowingly and willfully violate a regulation prescribed by the Secretary of the Treasury under Title 31, United States Code, Section 5314, to wit: Title 31, Code of Federal Regulations, Section 1010.350, that is, BERKO, having a financial interest in, and signature and other authority over, one or more bank accounts in a foreign country with an aggregate value greater than $10,000 during the calendar years stated in the table below, to wit: the Berko Ghana Account 1, did knowingly and willfully fail to report such relationships and provide information about said account to the U.S. Department of the Treasury as specified in FinCEN Form 114, Report of Foreign Bank and Financial Accounts, as follows:

| COUNT | CALENDAR YEAR | DATE FBAR DUE | ACCOUNT | LOCATION |
|---|---|---|---|---|
| FOUR | 2015 | June 30, 2016 | Berko Ghana Account 1 | Ghana |
| FIVE | 2016 | April 18, 2017 | Berko Ghana Account 1 | Ghana |
| SIX | 2017 | April 15, 2018 | Berko Ghana Account 1 | Ghana |

26

(Title 31, United States Code, Sections 5314, 5322(a) and 5322(b); Title 18, United States Code, Sections 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

72.     The United States hereby gives notice to the defendant that, upon his conviction of the offenses charged in Count One or Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

73.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c))

27

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

74. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

75. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
ROBERT ZINK
CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

29