**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> ASANTE KWAKU BERKO, <br><br>       Defendant. | Case No. 20-Cr-328 (DG) <br><br> **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT AND MOTION TO SUPPRESS MATERIALS SEIZED PURSUANT TO SEARCH WARRANT** <br><br> ORAL ARGUMENT REQUESTED |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ....................................................................................................................1

    A.    The Indictment ................................................................................................1

    B.    The Defendant's Arrest .................................................................................3

ARGUMENT .........................................................................................................................4

I.    The Indictment was Improperly Sealed .................................................................4

    A.    Relevant Legal Standard ................................................................................4

    B.    The Indictment was Improperly Sealed .........................................................6

    C.    The Unsealing of the Indictment was Unreasonably Delayed ..............................7

    D.    Although not required – Mr. Berko was Prejudiced .........................................8

II.    The Defendant's Right to a Speedy Trial Has Been Violated ..........................................10

    A.    The Length of Delay Was Presumptively Prejudicial and Uncommonly Long .........11

    B.    The Government is To Blame for the Delay ..........................................................12

    C.    Mr. Berko's Assertion of His Speedy Trial Right Is Timely ...............................14

    D.    The Nature and Length of Time of Delay is Presumptively Prejudicial ...............15

III.    The Email Search Warrant was Facially Deficient ..........................................................16

    A.    Relevant Legal Standard ................................................................................17

    B.    The Warrant Affidavit Improperly Relied on the CHS ......................................18

CONCLUSION .......................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Barker* v. *Wingo*, 407 U.S. 514 (1972) ..................................................................11, 12, 16

*Bivens* v. *United States*, 927 F. Supp. 1031 (E.D. Mich. 1996)......................................22

*Doggett* v. *United States*, 505 U.S. 647 (1992) .................................................11, 12, 15

*Illinois* v. *Gates*, 462 U.S. 213 (1983) ...........................................................................17

*Rayborn* v. *Scully*, 858 F.2d 84 (2d Cir. 1988) ..............................................................13

*Rivera* v. *United States*, 928 F.2d 592 (2d Cir. 1991) ...................................................19

*United States* v. *Banks*, No. 1:08–CR–510–DNH, 2009 WL 3165766 (N.D.N.Y. Sept. 29, 2009) ..........................................................................................................22

*United States* v. *Black*, 918 F.3d 243 (2d Cir. 2019) ..............................................10, 12

*United States* v. *Blanco*, 861 F.2d 773 (2d Cir. 1988).................................................13

*United States* v. *Brown*, 676 F. Supp. 2d 220 (S.D.N.Y. 2009) ....................................19

*United States* v. *Deglomini*, 111 F. Supp. 2d 198 (E.D.N.Y. 2000) ...................5, 8, 9, 10

*United States* v. *Fields*, 182 F. Supp. 2d 575 (E.D. Tex. 2002) ....................................17

*United States* v. *Frazier*, 423 F.3d 526 (6th Cir. 2005) ................................................20

*United States* v. *Giacalone*, 853 F.2d 470 (6th Cir. 1988) ..........................................22

*United States* v. *Gigante*, 436 F. Supp. 2d 647 (S.D.N.Y. 2006) ...............................5, 7

*United States* v. *Heckler*, 428 F. Supp. 269 (S.D.N.Y. 1976) ............................8, 10, 16

*United States* v. *Helton*, 314 F.3d 812 (6th Cir. 2003) .................................................22

*United States* v. *Heredia*, No. 02 CR. 1246 (SWK), 2003 WL 21524008 (S.D.N.Y. July 3, 2003) ..............................................................................................5

*United States* v. *Ingram*, 446 F.3d 1332 (11th Cir. 2006) ...........................................12

*United States* v. *Kozeny*, 541 F.3d 166 (2d Cir. 2008)...................................................4

*United States* v. *Leaver*, 358 F. Supp. 2d 255 (S.D.N.Y. 2004) .......................12, 13, 15

*United States* v. *Leon*, 468 U.S. 897 (1984) ...................................................................21

*United States* v. *Makki*, No. 06-20324, 2007 WL 781821 (E.D. Mich. Mar. 13, 2007) ...........................................................................................................................22

*United States* v. *New Buffalo Amusement Corp.*, 600 F.2d 368 (2d Cir. 1979)...........................12

*United States* v. *Ostroff*, 340 F. Supp. 2d 362 (S.D.N.Y. 2004) ...............................................................................................................11, 13, 15, 16

*United States* v. *Peterson*, 411 F. App'x 857 (6th Cir. 2011).........................................................12

*United States* v. *Reeves*, 210 F.3d 1041 (9th Cir. 2000).................................................................22

*United States* v. *Rocha-Gomez*, 412 F. Supp. 3d 369 (S.D.N.Y. 2019) .......................................20

*United States* v. *Rutherford*, 71 F. Supp. 3d 386 (S.D.N.Y. 2014).................................................22

*United States* v. *Salazar*, 945 F.2d 47 (2d Cir. 1991) .....................................................................20

*United States* v. *Schreane*, 331 F.3d 548 (6th Cir. 2003) ..............................................................12

*United States* v. *Sherwood*, 38 F.R.D. 14 (D. Conn. 1964) .............................................................8

*United States* v. *Slochowsky*, 575 F. Supp. 1562 (E.D.N.Y. 1983) .................................................5

*United States* v. *Srulowitz*, 819 F.2d 37 (2d Cir. 1987)........................................................4, 5, 6, 9

*United States* v. *Tigano*, 880 F.3d 602 (2d Cir. 2018).......................................................10, 15, 16

*United States* v. *Valiente-Mejia*, No. 04 CR 772 (NRB), 2009 WL 3401210 (S.D.N.Y. Oct. 19, 2009) .................................................................................11, 13, 15

*United States* v. *Vassell*, 970 F.2d 1162 (2d Cir. 1992)...............................................................11

*United States* v. *Wagner*, 989 F.2d 69 (2d Cir. 1993) ......................................................17, 18, 20

*United States* v. *Watson (Watson I)*, 599 F.2d 1149 (2d Cir. 1979) .......................................5, 8, 9

*United States* v. *Watson (Watson II)*, 690 F.2d 15 (2d Cir. 1979)..................................................9

*United States* v. *Weiss*, No. 92 Cr. 890, 1993 WL 256707 (S.D.N.Y. July 7, 1993) ..........5, 6, 7, 8

*United States* v. *Zuluaga*, 651 F. Supp. 746 (E.D.N.Y. 1986) .....................................................19

## CONSTITUTIONAL AMENDMENTS

U.S. Const. amend. VI ....................................................................................................10, 13, 15

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. §§ 78dd-1, et seq. ........................................................................17

18 U.S.C. § 371 ...........................................................................................17

18 U.S.C. § 3282 ...........................................................................................4

Federal Rule of Criminal Procedure 12(b)(3)(C) ........................................16

## PRELIMINARY STATEMENT

The defendant, Asante Kwaku Berko, moves to dismiss Indictment 20 Cr. 328 (DG) (the "Indictment") as the Government's prosecution suffers from fatal legal deficiencies.  Specifically, the Indictment was improperly sealed and Mr. Berko's arrest was unreasonably delayed, resulting in a circumvention of the statute of limitations and a violation of Mr. Berko's right to a speedy trial.  The defendant also seeks the suppression of his personal emails that were obtained pursuant to an unlawful search warrant.  The search warrant improperly relied on conclusory and uncorroborated statements from a confidential source whose credibility and reliability were never attested to in the warrant.  The warrant was so facially deficient that it should never have been granted or executed.  Accordingly, as discussed in detail below, the Court should grant the defendant's motion to dismiss the Indictment with prejudice.  Additionally, the Court should suppress the search warrant for Mr. Berko's personal emails.

## BACKGROUND

A.    The Indictment

Mr. Berko is charged with having participated in a scheme to pay bribes to Ghanian government officials to obtain the necessary approvals for a Turkish energy company, Aksa Enerji Uretim A.S. ("Aksa"),[1] to build and operate a power plant in Ghana.  (Indictment, Dkt. 3, ¶¶ 1-74).  The scheme allegedly began over a decade ago, lasting from December 2014 to March 2017.  (*Id.* ¶ 13).  The approvals Aksa purportedly needed included getting a "power purchase agreement" with the republic of Ghana and approval from the relevant Ghanian regulatory authority and power grid company to build and operate the plant.  (*Id.* ¶ 15).  Mr. Berko and his co-conspirators allegedly caused more than $700,000 in bribes to be paid to Ghanaian government officials in

---

[1] While the entities referenced in the Indictment are anonymized, we will refer to the entities by the names disclosed to us by the Government through discovery.

1

exchange for helping Aksa get the necessary approvals. (*Id.* ¶ 19). Mr. Berko allegedly participated in this scheme with four co-conspirators, none of whom were charged with any crimes. (*Id.* ¶¶ 7-10).

To pay the alleged bribes, the Indictment claims that Mr. Berko and his co-conspirators used two consulting companies based in Ghana: Tricorp Group Ltd. ("Tricorp") and RMG De Ghana Ltd. ("RMG"). (*Id.* ¶¶ 5, 6). Tricorp was allegedly used to collect funds from Aksa for bribes to Ghanaian officials and for payments to Mr. Berko and his co-conspirators. (*Id.* ¶ 5). RMG was allegedly used to collect reimbursement from Aksa for the bribes paid by Mr. Berko and his co-conspirators to Ghanian officials by issuing false invoices for fraudulent services. (*Id.* ¶ 6). The Indictment claims that these reimbursements transferred from bank accounts in Turkey, through bank accounts in the United States, and finally to bank accounts in Ghana, including two bank accounts in Mr. Berko's name. (*Id.* ¶ 17).

To establish jurisdiction, the Indictment states that at the time of the charged scheme, Mr. Berko was working as an investment banker in London at a subsidiary of the Goldman Sachs Group, Inc. ("Goldman Sachs"). (*Id.* ¶ 1). Aksa was a client of Goldman Sachs and Goldman Sachs owned 16 percent of the shares in Aksa. (*Id.* ¶ 4). The Indictment claims that Mr. Berko was a member of the team at Goldman Sachs that planned to arrange a loan of approximately $190 million to Aksa to build the power plant and a letter of credit for the Republic of Ghana of approximately $75 million related to the operation of the plant. (*Id.* ¶ 21). The Indictment claims that the financing fees Goldman Sachs stood to gain should the power plant be completed would be approximately $10.3 million for the loan and over $1 million for the letter of credit. (*Id.*). However, Goldman Sachs ultimately did not provide any financing for the project and therefore did not receive any of the fees referenced in the Indictment. For Mr. Berko's alleged conduct, he

is charged with violating the foreign corrupt practices act (the "FCPA"), conspiring to violate the foreign corrupt practices act, and conspiring to commit money laundering.

B.    The Defendant's Arrest

Mr. Berko became aware of the U.S. Department of Justice's (hereinafter, the "DOJ") and the U.S. Securities and Exchange Commission's (hereinafter, the "SEC") investigation into him as early as 2017.  In February 2017, he retained the law firm of Morrison & Foerster LLP ("MoFo") to represent him and approximately three months later he agreed to a proffer with both the DOJ and the SEC.  (*See* Declaration of Carl H. Loewenson, Jr. ("Loewenson Decl."), ¶ 2).  The proffer took place on May 18, 2017, in New York City at MoFo's offices.  (*Id.* ¶ 3).  At the time, Mr. Berko was not living in the United States but was splitting his time between Ghana and London, which he told the Government at his proffer.  (*Id.* ¶ 4).  Indeed, the DOJ gave Mr. Berko a "safe passage letter" to assist him in traveling to the United States for his proffer.  (*Id.* ¶ 3).  Mr. Berko's interview lasted over eight hours and he answered all of the Government's questions.  (*Id.* ¶ 4).  Following Mr. Berko's proffer, the DOJ did not communicate with Mr. Berko's attorneys at MoFo for the next several years.  (*Id.*).

On April 13, 2020, nearly three years after Mr. Berko interviewed with the DOJ and the SEC, the SEC charged Mr. Berko by complaint with violating provisions of the FCPA.  (*Id.* ¶ 5; *see also* Declaration of Robert L. Boone ("Boone Decl."), Ex. C).  Approximately four months later, on August 26, 2020, the DOJ obtained the Indictment against Mr. Berko, which was filed under seal.  (Loewenson Decl. ¶ 7).  The statute of limitations on the FCPA related charges was set to expire just days later in September 2020.  The DOJ did not communicate with Mr. Berko's lawyers about the existence of the Indictment.  (*Id.* ¶ 8).  This remained the case even while Mr. Berko was actively defending himself against the SEC's charges, ultimately entering a final judgment with the SEC on June 23, 2021.  (*See id.* ¶ 5; *see also* Boone Decl., Ex. D).  The

Indictment remained under seal until Mr. Berko's arrest on November 3, 2022, at London Heathrow Airport. (Loewenson Decl. ¶ 7). After Mr. Berko's arrest, the DOJ sought Mr. Berko's extradition from the United Kingdom in or about December 2022. Ultimately, Mr. Berko was extradited to the United States on July 15, 2024, nearly four years after the Indictment against him was issued.

**ARGUMENT**

## I.    The Indictment was Improperly Sealed

This case is barred by the statute of limitations due to the improper sealing of the Indictment and the unreasonable delay in unsealing the Indictment. Accordingly, the Court should dismiss the Indictment with prejudice.

### A.    Relevant Legal Standard

In the criminal context, statutes of limitations require that an indictment be "found" within a certain period of time, and an indictment ordinarily is "found" when it is returned by the grand jury and filed. *See United States* v. *Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987). Title 18, Section 3282(a) states that "[e]xcept as otherwise expressly provided by law," an indictment in non-capital cases must be "found . . . within five years … after such offense shall have been committed." 18 U.S.C. § 3282(a). The charges of violating the foreign corrupt practices act, conspiring to violate the foreign corrupt practices act, and conspiring to commit money laundering are all subject to this five-year statute of limitations. *United States v. Kozeny*, 541 F.3d 166, 168–69 (2d Cir. 2008). An indictment that is sealed generally tolls the statute of limitations. Accordingly, when a timely filed indictment is not unsealed until after the expiration of the statute of limitations, the statute is ordinarily not a bar to prosecution, as the statute is generally tolled as of the date of the filing. *United States* v. *Gigante*, 436 F. Supp. 2d 647, 654 (S.D.N.Y. 2006) (citing *Srulowitz*, 819 F.2d at 40).

4

There are exceptions to this rule. If, for example, the Government lacks a proper purpose in sealing the indictment, the indictment is considered to be found upon the date of its unsealing. *See United States* v. *Deglomini*, 111 F. Supp. 2d 198, 200 (E.D.N.Y. 2000) (citing *Srulowitz*, 819 F.2d at 40). In that case, the expiration of the limitations period prior to unsealing would result in dismissal of the indictment, as it would in any case in which an indictment were untimely. *Deglomini,* 111 F. Supp. 2d at 200 (citing *United States* v. *Slochowsky*, 575 F. Supp. 1562, 1567 (E.D.N.Y. 1983)). Even if the Government has a legitimate prosecutorial purpose for sealing an indictment, the time period in which the indictment may remain sealed is not boundless. *Deglomini*, 111 F. Supp. 2d at 200. Rather, the Government is required to unseal the indictment "as soon as its legitimate need for delay has been satisfied." *Id*. (quoting *United States* v. *Watson (Watson I)*, 599 F.2d 1149, 1154 (2d Cir. 1979)). This policy furthers the public's interest in prompt investigation of cases, as well as the interest in avoiding the "inevitable prejudice to the defendant occasioned by the delay." *Watson I*, 599 F.2d at 1154.

The Second Circuit has developed a three-part inquiry when defendants challenge the sealing of an indictment. *See United States* v. *Weiss*, No. 92 Cr. 890, 1993 WL 256707, at *4 (S.D.N.Y. July 7, 1993). "First, the Court must examine whether the original decision to seal the indictment [was] proper. If the initial sealing was not justified, there is no tolling the statute of limitations, and the indictment must be dismissed as untimely. Second, assuming a proper sealing, whether the length of time the indictment was sealed was reasonable. Third, was the defendant prejudiced by the sealing of the indictment." *United States* v. *Heredia*, No. 02 CR. 1246 (SWK), 2003 WL 21524008, at *6 (S.D.N.Y. July 3, 2003) (citations omitted).

A defendant's right to challenge the propriety of the sealing is "fully protected by affording him the right to a hearing *after* the indictment is opened to the public." *See Srulowitz,* 819 F.2d at

41; *see also Weiss*, 1993 WL 256707, at *1.  At that hearing, "the Government bears the burden of demonstrating that there were legitimate prosecutorial purposes for sealing." *Weiss*, 1993 WL 256707, at *1.

  B. <u>The Indictment was Improperly Sealed</u>

  Here, the Government has yet to articulate what the basis was for sealing the Indictment. On February 13, 2025, defense counsel submitted a letter to the Government requesting various discovery information, including the Government's stated reason to the Magistrate Judge for the request to have the Indictment filed under seal, the substance of any conversation had between the Government and the Magistrate Judge regarding the sealing request, and all of the documentation related to their request.  (*See* Boone Decl., Ex. E, at 2).  The Government refused to provide any information, stating in a letter to defense counsel dated March 6, 2025, that "[t]his information is not subject to discovery under Rule 16."  (*See* Boone Decl. Ex. F, at 4).

  As stated earlier, it is well established that the Government must show it had a reasonable and good faith basis for requesting the sealing of the indictment.  *See Srulowitz*, 819 F.2d at 40. The Government cannot simply decline its burden.  In any event, to the extent the Government intends to claim that the sealing of the Indictment was necessary to maintain secrecy concerning its investigation, or that Mr. Berko posed a flight risk or a risk of safety of arresting officers, those arguments are unavailing.

  Mr. Berko was clearly aware of the investigation against him for nearly the entirety of the investigation.  Not only were Mr. Berko's lawyers at MoFo in contact with the Government regarding their investigation, Mr. Berko voluntarily interviewed with the Government for over eight hours concerning their investigation.  (Loewenson Decl., ¶ 4).  Moreover, Mr. Berko was the only defendant charged in the Indictment, so there was no concern that an unsealed Indictment would tip off other defendants who were unaware of the investigation.  Furthermore, Mr. Berko's

whereabouts were never unknown.  Mr. Berko told the Government at his proffer that he was splitting time between Ghana and London.  (*Id.*).  Indeed, he was arrested leaving London to return to Ghana.  (*Id.* ¶ 7).  In addition, at the time of the Indictment's sealing, Mr. Berko was actively litigating in court against the SEC's complaint regarding the same conduct alleged in the Indictment.  (*Id.* ¶¶ 5, 6).  He was not hiding from the Government's investigation, nor has he ever done so.  To the contrary, Mr. Berko cooperated with the Government's investigation from the beginning.  (*See id.* ¶ 3).

Accordingly, the Government's motivation for sealing the Indictment could not have stemmed from a need to keep their investigation secret, a fear that Mr. Berko would flee, or a concern for the safety of the arresting officers.  As the Government has failed to establish a legitimate prosecutorial objective for sealing, the Indictment should be dismissed.  *See Gigante*, 436 F. Supp. 2d at 657 (finding that the Government was not justified in sealing indictments when the defendant "was well aware for nearly the entire duration of the five-year investigation that he was being investigated, and his counsel was in frequent contact with the Government about the investigation").  Alternatively, the defendant requests a hearing where the Government bears the burden of demonstrating that there were legitimate prosecutorial purposes for sealing the Indictment.  *See Weiss*, 1993 WL 256707, at *1.

C.    The Unsealing of the Indictment was Unreasonably Delayed

Even if the sealing of the Indictment was proper, the DOJ's two-year delay in unsealing the Indictment was unreasonable.  "Once an indictment is sealed, the Government must exercise reasonable care in locating the defendant."  *Weiss*, 1993 WL 256707, at *6.  This is especially true where the sealing of the indictment extends beyond the period established by the statute of limitations.  "[W]hen a sealed indictment has tolled the statute of limitations, the policy of repose underlying the statute demands that the Government unseal the indictment as soon as its legitimate

need for delay has been satisfied." *Watson I*, 599 F.2d at 1154.  Indeed, a court has found that "a period of more than twelve months" after the statute of limitations has expired "is not reasonable." *United States* v. *Heckler*, 428 F. Supp. 269, 272 (S.D.N.Y. 1976); *see also United States* v. *Sherwood*, 38 F.R.D. 14, 20 (D. Conn. 1964) (finding a thirteen-month delay in unsealing to be unreasonable); *Deglomini*, 111 F. Supp. 2d. at 200 (finding a fourteen-month delay in unsealing to be unreasonable).

Here, the Government does not appear to have taken the most basic steps to effectuate Mr. Berko's arrest, resulting in an unsealing delay of over two years.  Despite knowing that Mr. Berko was cooperating with their investigation and was represented by lawyers at MoFo, the DOJ never contacted Mr. Berko's lawyers about the Indictment or the possibility of Mr. Berko surrendering to law enforcement authorities.  (Loewenson Decl., ¶ 8).  The DOJ also never bothered to seek Mr. Berko's extradition from Ghana, despite Mr. Berko telling the DOJ that he lived there and was a citizen of the country.  Indeed, Mr. Berko had been living openly in Ghana for several years before his arrest and it is unclear if the DOJ ever conducted surveillance or contacted anyone or any entity in Ghana to confirm Mr. Berko's location.  (*Id.* ¶ 7).  Accordingly, the Court should find that the Government took unreasonably long to unseal the Indictment as it failed to "exercise reasonable care in locating the defendant."  *Weiss*, 1993 WL 256707, at *6.  Alternatively, the Court should hold an evidentiary hearing to determine whether the Government fulfilled its obligation to "make appropriate efforts" to locate Mr. Berko.  *Id.* at *6.

> ### D.    Although not required – Mr. Berko was Prejudiced

The Second Circuit has not squarely addressed whether a showing of prejudice is required to dismiss an indictment found after the statute of limitations period has expired.  *See Deglomini*, 111 F. Supp. 2d at 202.  If the government fails to indict by the time the limitations period has expired, no showing of prejudice is required.  The prosecution is barred "however strong the

prosecutorial interest may be." *United States* v. *Watson (Watson II)*, 690 F.2d 15, 16 (2d Cir. 1979). Similarly, the Second Circuit has held that no prejudice must be shown if the government lacks legitimate prosecutorial purposes in sealing the indictment in the first instance and the limitations period expires before unsealing. *Srulowitz*, 819 F.2d at 40–41. The Second Circuit has only required a showing of prejudice when it has held that the indictment was timely handed up and properly sealed for a reasonable time. In such a case, a defendant must demonstrate that he was actually prejudiced by the delay. *See Watson I*, 599 F.2d at 1155.

Here, where the delay in unsealing the Indictment was clearly unreasonable, prejudice should not be required. While the Second Circuit has yet to explicitly address this issue, the Eastern District of New York has in *United States* v. *Deglomini*, 111 F. Supp. 2d 198, 202 (E.D.N.Y. 2000). In *Deglomini*, the district court dismissed an indictment that was handed up prior to the expiration of the limitations period and placed under seal, but was not unsealed until fourteen months later, and during that time, the limitations period ran. *Id.* at 198–99. The prosecutors in *Deglomini* "implicitly concede[d] that the delay in unsealing the indictment was unreasonable," but argued that "any time an indictment is sealed properly, the defendant must show actual prejudice in order to prevail on statute of limitations grounds." *Id.* at 200. The court disagreed, noting that, "[a]lthough no Second Circuit opinion has explicitly addressed this issue, the policies underlying the statute of limitations . . . suggest that no showing of prejudice ought to be required when the government unreasonably delays unsealing the indictment." *Id.* at 202. The court reasoned: "Requiring a showing of actual prejudice to the defendant would give the government carte blanche, creating potential for abuse. At the theoretical extreme, even a patently unjustified delay of virtually limitless duration would toll the limitations period, so long as the

defendant is unable to meet the burden of proving actual prejudice to his defense as a result of the delay." *Id*. at 203.

We agree.  The Government cannot have carte blanche to unreasonably delay the unsealing of an indictment and then put the burden on the defendant to explain how he was prejudiced by the Government's failing.  Accordingly, we request that the Court dismiss the Indictment without requiring a showing of prejudice.  In any event, Mr. Berko was obviously prejudiced by the Government's delay of over two years.  At a minimum, given that the charged scheme now ended almost a decade ago, there is prejudice with respect to Mr. Berko's memory, the location of witnesses who might be able to support his view, and the memory of those witnesses.  *See Heckler*, 428 F. Supp. at 272 (finding that the defendant was prejudiced by the Government's delay in bringing the Indictment and unsealing the Indictment as "[i]t defies reason to expect a defendant to retain details as to dates, the substance of conversations or other material after the expiration of seven years from the date of the acts alleged").

## II.    The Defendant's Right to a Speedy Trial Has Been Violated

The Government's delay and lack of diligence in arresting Mr. Berko also violated his right to a speedy trial under the Sixth Amendment.  Accordingly, the Court should dismiss the Indictment with prejudice.

The Sixth Amendment to the Constitution guarantees a "speedy trial" for those accused of committing a crime.  U.S. Const. amend. VI.  This right to a speedy trial "has been deemed fundamental to our system of justice since its inception." *United States* v. *Black*, 918 F.3d 243, 253 (2d Cir. 2019) (citation omitted).  The "only remedy" for a constitutional speedy trial violation is dismissal with prejudice.  *United States* v. *Tigano*, 880 F.3d 602, 619 (2d Cir. 2018).

In *Barker* v. *Wingo*, 407 U.S. 514 (1972), the Supreme Court identified four factors that must be balanced when considering whether the right to a speedy trial has been violated: "whether

delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett* v. *United States*, 505 U.S. 647, 651 (1992) (citing *Barker*, 407 U.S. at 530). None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. Here, because all four *Barker* factors weigh against the Government, the Indictment must be dismissed.

A.    The Length of Delay Was Presumptively Prejudicial and Uncommonly Long

The speedy trial right is triggered by "arrest, indictment or other official accusation." *Doggett*, 505 U.S. at 655. The first factor entails a "double enquiry." *Id.* at 651. As a threshold matter, courts must first determine whether the delay in question "has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Id*. at 651–52 (citations omitted). Within the Second Circuit, there is a "general consensus that a delay of over eight months meets this [presumptively prejudicial] standard, while a delay of less than five months does not." *United States* v. *Ostroff*, 340 F. Supp. 2d 362, 366 (S.D.N.Y. 2004) (quoting *United States* v. *Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992)).

If a delay is presumptively prejudicial, courts move on to the full *Barker* analysis. Because there is no bright line definition of a delay that is "uncommonly long," courts conduct a contextual, case-by-case assessment that considers the nature and complexity of the crime. *See Ostroff*, 340 F. Supp. 2d at 367. Within the Second Circuit, courts have consistently deemed a delay of approximately four and a half years to be "uncommonly long" under the *Barker* analysis. *See, e.g., United States* v. *Valiente-Mejia*, No. 04 CR 772 (NRB), 2009 WL 3401210, at *6 (S.D.N.Y. Oct. 19, 2009) (finding delay of fifty-eight months in between indictment and arrest "uncommonly long" in an illegal reentry case); *United States* v. *New Buffalo Amusement Corp.*, 600 F.2d 368,

377 (2d Cir. 1979) (finding a delay of four and one-half years in between indictment and trial in an obscenity case "unquestionably substantial" and "clearly enough to 'trigger' the constitutional analysis with respect to the other elements of the *Barker* test").  Other federal courts have found an even shorter delay to be "uncommonly long."  *See United States* v. *Peterson*, 411 F. App'x 857, 861 (6th Cir. 2011) (finding a delay of fifteen months in between indictment and trial "uncommonly long in an armed robbery case); *United States* v. *Schreane*, 331 F.3d 548, 553 (6th Cir. 2003) (finding a delay of twenty-nine months in between arrest and trial "uncommonly long" in unlawful possession of a firearm case).  Courts may also consider the length of time between the alleged crime and the indictment.  *United States v. Leaver*, 358 F. Supp. 2d 255, 269 (S.D.N.Y. 2004) ("It is particularly clear that the delay was uncommonly long in light of the five years that had already elapsed between the alleged crime and the indictment."); *see also United States v. Ingram*, 446 F.3d 1332, 1339 (11th Cir. 2006) (similar).

In the present case, Mr. Berko was indicted in August 2020.  The delay between indictment and trial has already passed four and a half years, which is not only presumptively prejudicial, but also "uncommonly long" given the nature of the case.[2]  The delay is also uncommonly long given that the Government waited until August 2020, just a few days before the five-year statute of limitations was set to expire for some alleged conduct, before bringing its sealed indictment.  *See Leaver*, 358 F. Supp. 2d at 269.  This delay weighs heavily in Mr. Berko's favor.

B.    The Government is To Blame for the Delay

---

[2] In *Barker,* the Supreme Court noted that "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."  407 U.S. at 531.  Even for conspiracy charges, courts have found that a delay of about 5 to 8 years is "uncommonly long" for a case involving conspiracy charges. *See Black*, 918 F.3d at 255 (dismissing indictment for Hobbs Act conspiracy charges where delay before trial was nearly five years and eight months); *Doggett*, 505 U.S. at 657 (dismissing indictment for conspiracy to import cocaine where the pretrial delay was eight and a half years).

The Sixth Amendment requires the government "to exercise due diligence in attempting to locate and apprehend the accused." *Rayborn* v. *Scully*, 858 F.2d 84, 90 (2d Cir. 1988); *see also United States* v. *Blanco*, 861 F.2d 773, 778 (2d Cir. 1988) ("It is clear that the government has a constitutional duty to make a diligent, good faith effort to bring a defendant to trial promptly."). Although the government is not expected to make "heroic efforts to apprehend a defendant," *Rayborn*, 858 F.2d at 90, it must demonstrate that it made a "serious effort to locate or apprehend" a defendant who has been formally accused of a crime to avoid a Sixth Amendment violation, *Ostroff*, 340 F. Supp. 2d at 369. The government's obligation under the Sixth Amendment "does not end because an accused [individual] is outside the United States." *Leaver*, 358 F. Supp. 2d at 265. Instead, "the Government has a duty to seek extradition, unless such effort would be futile." *Id.* (citing *Blanco*, 861 F.2d at 778). A "defendant's claim that the government violated her right to a speedy trial is seriously undermined when the defendant, and not the government, is the cause of the delay." *Blanco*, 861 F.2d at 778–80 (attributing delay to defendant who tried to avoid apprehension and detection); *see also Valiente-Mejia*, 2009 WL 3401210, at *8 ("Where a defendant uses an alias to evade law enforcement, the second *Barker* factor weighs in the Government's favor.").

Here, the delay is clearly attributable to the Government. As explained earlier, the Government knew more than enough information to have quicky found Mr. Berko. At a minimum, the Government knew Mr. Berko's lawyers at MoFo, it knew Mr. Berko was a citizen of Ghana, and it knew Mr. Berko was living in Ghana. (Loewenson Decl., ¶¶ 3, 4). Whatever further information the Government needed it could have simply asked for through Mr. Berko's attorneys or from Mr. Berko himself, as Mr. Berko was cooperating with the Government's investigation. (*See id.*). Instead, the Government chose to do next to nothing to find Mr. Berko. Indeed, there is

13

no evidence in the Government's discovery materials that it even took the most basic step of seeking Mr. Berko's extradition from Ghana. Nor is there any evidence that the Government determined that seeking extradition from Ghana would be futile.

To the contrary, there is clear evidence that Mr. Berko was not trying to evade prosecution but face it head on. This is explained in the accompanying declaration of Carl H. Loewenson, Jr., Mr. Berko's prior counsel at MoFo. (*See* Loewenson Decl.). According to Mr. Loewenson, on April 13, 2020, the SEC filed a civil complaint against Mr. Berko and notified him of that development. (*Id.* ¶ 5). In Mr. Loewenson's experience, when the DOJ and the SEC conduct separate but parallel investigations, the DOJ brings criminal charges, if any, at the same time the SEC files its civil enforcement action. (*Id.*). On April 17, 2020, Mr. Loewenson asked DOJ attorney Katherine Nielsen in a telephone call about the DOJ's intentions to bring criminal charges against Mr. Berko. (*Id.*). In substance, she declined to discuss the matter. (*Id.*). At that point (and in the years that followed until Mr. Berko's arrest in November 2022), Mr. Loewenson inferred that the DOJ had decided not to bring criminal charges against Mr. Berko. (*Id.*). To Mr. Loewenson's knowledge, Mr. Berko had been living openly in Ghana for several years before he was arrested at London Heathrow Airport on his way to Ghana. (*Id.* ¶ 7).

For the foregoing reasons, there is no question that the Government is responsible for the delay at issue. Indeed, the delay continues as the Government has struggled to complete its discovery production obligations. Since Mr. Berko's initial appearance in the United States on July 16, 2024, the Government has taken almost a full year to produce discovery. In fact, the Government produced additional discovery just last week on June 23, 2025. Accordingly, the second *Barker* factor weighs in defendant's favor.

C.     Mr. Berko's Assertion of His Speedy Trial Right Is Timely

Courts in this circuit have recognized the third *Barker* factor is "most relevant in the context of a habeas petition." *Valiente-Mejia*, 2009 WL 3401210, at *7 (S.D.N.Y. Oct. 19, 2009) (quoting *Leaver*, 358 F. Supp. 2d at 265). If a defendant is unaware of the indictment, he cannot "be taxed for invoking his speedy trial right only after his arrest." *Doggett*, 505 U.S. at 654. "[A] defendant's failure to formally raise the right [to a speedy trial] via motion does not necessarily count against the defendant." *Tigano*, 880 F.3d at 617–18. "Formal procedural requirements are out of place in [the] context" of the third *Barker* factor. *Id.* at 618.

Here, Mr. Berko was unaware of his indictment in August 2020 until his arrest in London in November 2022. (Loewenson Decl., ¶¶ 5, 7). He had no opportunity to assert his right to a speedy trial until he was arraigned in federal court in the Eastern District of New York in July 2024. Since his arraignment, Mr. Berko has consistently raised concerns about the delay in the Government's production of discovery and asserted his right to a speedy trial. (*See* Boone Decl., Ex. G, at 4:23-6:23). Therefore, the third factor weighs in Mr. Berko's favor.

D.    The Nature and Length of Time of Delay is Presumptively Prejudicial

The fourth *Barker* factor of whether the defendant has been prejudiced is related to the length of the delay and the reason for the delay. "Where there is a 'prolonged and unjustifiable delay in prosecution,'" a defendant is "not *required* to demonstrate any specific prejudice." *Ostroff*, 340 F. Supp. 2d at 371 (citing *Doggett*, 505 U.S. at 657); *see also Tigano*, 880 F.3d at 618 ("Affirmative proof of impairment of the defense is not required to find a Sixth Amendment violation."). Accordingly, when the "Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence … nor persuasively rebutted, the defendant is entitled to relief." *Doggett*, 505 U.S. at 658 (citation omitted).

15

Loss of exculpatory evidence and dimming memories are the most serious forms of prejudice to the defendant "because the inability of a defendant to adequately prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532. If "the defendant asserts prejudice, either general or particularized, as a result of the delay, the Government has an affirmative burden to rebut that claim." *Ostroff*, 340 F. Supp. 2d at 368.

Here, as explained earlier, there is no question that the delay has been prolonged and unjustifiable. Indeed, the Government's delay of over two years to find Mr. Berko, when they could have easily reached out to him or his counsel, or even sought his extradition from Ghana, is inexcusable. As such, the delay is presumptively prejudicial. Moreover, given that the charged scheme ended almost a decade ago, there is significant prejudice to Mr. Berko with respect to his memory, the location of witnesses who might be able to support his view, and the memory of those witnesses. *See Heckler*, 428 F. Supp. at 272 (finding that the defendant was prejudiced by the Government's delay in bringing the indictment and unsealing the indictment as "[i]t defies reason to expect a defendant to retain details as to dates, the substance of conversations or other material after the expiration of seven years from the date of the acts alleged"). Accordingly, the fourth *Barker* factor weighs heavily against the Government.

Because all four *Barker* factors weigh against the Government, this Court should dismiss the indictment with prejudice. *Tigano*, 880 F.3d at 619 ("The only remedy is to dismiss the case with prejudice . . . .").

## III. The Email Search Warrant was Facially Deficient

The defendant moves to suppress all evidence resulting from a search of his personal email account pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). On or about April 27, 2017, the Government applied for and received a search warrant to search the content associated with three Gmail accounts, including the defendant's personal email account, berkoas@gmail.com (the

"Berko Account"). (*See* Boone Decl., Exs. A, B). The search warrant sought the entirety of the defendant's Gmail account from January 1, 2014, to the present and authorized the Government to review the seized materials with no limitations. The affidavit in support of the search warrant (the "April 2017 Warrant Affidavit"), claimed that there was probable cause to believe that these accounts contained evidence of criminal violations of the Foreign Corrupt Practices Act, in violation of 15 U.S.C. §§ 78dd-1, et seq., and conspiracy to commit such crimes, in violation of 18 U.S.C. § 371. (*Id.* Ex. B). The April 2017 Warrant Affidavit largely relied on statements purportedly made by a confidential human source ("CHS") to show probable cause. Remarkably, the affidavit fails to provide any information whatsoever regarding the CHS's credibility or reliability. Moreover, the affidavit fails to cite a single fact to independently corroborate the CHS's story. As "[g]eneralized, uncorroborated statements of an unidentified informant . . . are insufficient to establish probable cause," *United States* v. *Fields*, 182 F. Supp. 2d 575, 580 (E.D. Tex. 2002), the Government must be precluded from using any of the fruits of the search of Mr. Berko's email account at trial.

A.     Relevant Legal Standard

In *Illinois* v. *Gates*, 462 U.S. 213, 230-31 (1983), the Supreme Court set forth a "totality-of-the circumstances" test for determining probable cause to support a search warrant. The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. at 238.

In *United States* v. *Wagner*, 989 F.2d 69, 72–73 (2d Cir. 1993), the Second Circuit embraced the totality-of-the-circumstances test outlined in *Gates* and addressed how to assess probable cause based on information provided by an informant. The Circuit Court noted that the

"core question" in assessing probable cause based upon information supplied by an informant is "whether the information is reliable." *Id*. at 72. It found that "[i]nformation may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence." *Id*. at 72-73. The Second Circuit went on to note that if a substantial amount of information from an informant is shown to be reliable because of independent corroboration, "then it is a permissible inference that the informant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable." *Id*.

B.    The Warrant Affidavit Improperly Relied on the CHS

The April 2017 Warrant Affidavit relies heavily on statements made by the CHS to make its probable cause showing. Indeed, all direct references to bribe payments in the affidavit are based on information the CHS purportedly provided to the Government. Specifically, the affidavit relies on the CHS to make the following claims:

- According to the CHS, in 2014, Berko told the CHS that he was trying to get access to Michael Mahama and Suleman Iddrisu to help him obtain Ghanian government approvals for Aksa to build a power plant in Ghana. (Ex. B, ¶ 16). The affidavit claims that Mahama and Iddirssu were relatives of the then president of Ghana, John Dramani Mahama. (Ex. B, ¶¶ 9, 11).

- According to the CHS, this led Berko to contact Lyndon Mettle, an alleged business associate of President Mahama, who ultimately agreed to provide Aksa with services, "including the bribing of government officials [] through Tricorp." (Ex. B, ¶ 16).

- According to the CHS, the CHS learned from Berko and Mettle that Michael Mahama and Suleman Iddrissu wanted to be paid $50 million to secure President Mahama's support for the necessary government approvals to build the power plant. (Ex. B, ¶ 16).

- The CHS further claimed that based on his conversations with Berko and Mettle, Berko and others agreed to pay Michael Mahama and Suleman Iddrissu approximately $40 million, "at least in part for the benefit of President Mahama," in exchange for obtaining government approvals for Aksa to build the power plant. (Ex. B, ¶ 16).

18

- According to the CHS, on one occasion when the CHS was in Mettle's office in Ghana, the CHS observed "large piles of cash" sitting on top of a desk that the CHS "understood were to be given to various government officials," including the Minister of Energy.  (Ex. B, ¶ 18).

- According to the CHS, Tricop was a business entity "controlled by President Mahama and his family," including Michael Mahama and Suleman Iddrissu.  (Ex. B, ¶ 18). The CHS purportedly provided the Government with part of an agreement with Tricorp, which the CHS claimed to have obtained from Mettle's office.  (Ex. B, ¶ 18).

- According to the CHS, based on his conversations with Mettle and Berko, he understands that Francis Dzata, the technical adviser to the Minister of Power at the time, "received $1 million in bribes to facilitate government approvals of the Power Purchase agreement."  (Ex. B, ¶ 19).  The CHS claimed that he knew of one occasion when Dzata, Mettle, and Berko were in Mettle's office in Ghana "arguing about Dazata's bribe amount."  (Ex. B, ¶ 19).

- According to the CHS, in or about August 2016, Berko told the CHS that Goldman had investigated him in connection with an email he received from Mettle at his work email address.  (Ex. B, ¶ 31).  The CHS claimed that Berko told the CHS that he was "very upset at Mettle" for sending him the email and thought that Mettle, Michael Mahama, and Suleman Iddrissu were "trying to set him up."  (Ex. B, ¶ 31).

Despite the affidavit's repeated reliance on the CHS, it is completely silent as to any background information relating to the CHS and why he/she can be trusted.  Strangely, the affidavit does not even attempt to attest to the CHS's credibility or reliability.  That is not normal.  *See e.g.*, *Rivera* v. *United States*, 928 F.2d 592, 597 (2d Cir. 1991) (finding probable cause where the search warrant affidavit made clear that the confidential informant had previously provided information leading to the seizure of weapons and narcotics); *United States* v. *Brown*, 676 F. Supp. 2d 220, 227 (S.D.N.Y. 2009) (finding probable cause where the warrant affidavit stated that the confidential informant had been on the police department payroll for over two years and had provided information proven to be reliable); *see also United States* v. *Zuluaga*, 651 F. Supp. 746, 750 (E.D.N.Y. 1986) (finding probable cause where the confidential informant previously provided information leading to at least 35 convictions and the seizure of approximately 90 pounds of cocaine).

There is also no mention in the affidavit of how the CHS became a source for the Government and whether he/she may have been improperly motivated to provide information against Mr. Berko. *See United States* v. *Rocha-Gomez*, 412 F. Supp. 3d 369, 374–75 (S.D.N.Y. 2019) (critiquing a search warrant affidavit for failing to establish the informant's reliability and motives). Furthermore, there is no mention of whether the CHS met with the Government in person to share this information, or if the information was gathered over the phone. *See United States* v. *Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."). Lastly, it is not clear from the affidavit whether the CHS remained anonymous to the Government or was eventually identified. By identifying the CHS, the Government could have obtained information about the CHS's history that may have spoken to his/her reliability as a source. For instance, the Second Circuit has noted whether an informant has "[p]rior convictions are a relevant consideration in determining probable cause." *See Wagner*, 989 F.2d at 73. Ultimately, the affidavit is completely bereft of any information about the CHS.

Moreover, there is no evidence in the April 2017 Warrant Affidavit that the Government corroborated the information the CHS provided. "While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." *United States* v. *Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (citation omitted). Here, there is nothing in the affidavit corroborating the CHS's bribery allegations. For example, the CHS claims that: (1) Berko was trying to get access to Michael Mahama and Suleman Iddrissu to help him obtain Ghanian government approvals for Aksa to

20

build a power plant in Ghana; (2) Michael Mahama and Suleman Iddrissu wanted to be paid $50 million to secure President Mahama's support for the necessary government approvals to build the power plant; and (3) Berko and others agreed to pay Michael Mahama and Suleman Iddrissu approximately $40 million, in part to benefit President Mahama, in exchange for obtaining government approvals for Aksa to build the power plant. (Ex. B, ¶ 16). But there is nothing in the affidavit corroborating any of this information. The affidavit does not claim that the affiant, Justin A. McNair, a special agent with the Federal Bureau of Investigation, took any steps to confirm the CHS's bribery claims. There are zero references to emails, recorded conversations, documents, witness interviews, or other evidence that would independently support these allegations. At most, the affidavit characterizes a random assortment of emails and documents (but attaches none) the Government purportedly received from Goldman Sachs that discuss Aksa's efforts to obtain a power purchase agreement, but stops short of claiming that any of these emails or documents discuss bribe payments. The only purported evidence of bribe payments comes from the uncorroborated statements of the CHS whose reliability is unknown.

The Government may seek to rely on the so-called "good faith" exception to the exclusionary rule. That reliance is misplaced. The good-faith exception does not apply when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," where an affidavit, on which the warrant is based, is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States* v. *Leon*, 468 U.S. 897, 923 (1984) (internal quotation marks omitted). Here, it was patently unreasonable for Agent McNair to rely on the search warrant, given that it was primarily based on the uncorroborated statements of an informant whose credibility and reliability were not attested to. As explained above, the law is clear on what is required when using information in a search warrant

21

from a confidential informant.  No reasonably well-trained officer could believe that a warrant based on conclusory and uncorroborated statements from an untested source is valid.  *See  United States* v. *Helton*, 314 F.3d 812, 824–25 (6th Cir. 2003) (finding the good-faith exception did not apply because a reasonable officer would know that the evidence "came well short of establishing probable cause" where it relied on statements from "an unknown, untested source," were "sparse in relevant detail[s]," and "were not corroborated in any meaningful manner"); *see also United States* v. *Rutherford*, 71 F. Supp. 3d 386, 393 (S.D.N.Y. 2014) (finding that the issuing judge had abandoned her judicial role by relying on officer's conclusory assertions that unlawful activity had occurred).  Accordingly, the Court should exclude all evidence resulting from the search of Mr. Berko's personal email account.

Alternatively, if the Court does not determine based upon the foregoing that the proceeds of the search warrant are inadmissible, the defense requests a *Franks* hearing.  "Courts have held *Franks* hearings where a defendant has shown that an affiant recklessly depended on and included information from unreliable informants."  *United States* v. *Makki*, No. 06-20324, 2007 WL 781821, *10 (E.D. Mich. Mar. 13, 2007); *United States* v. *Banks*, No. 1:08–CR–510–DNH, 2009 WL 3165766, *4 (N.D.N.Y. Sept. 29, 2009) (conducting a *Franks* hearing where the affiant omitted facts that undermined the credibility of the complainant); *see also United States* v. *Giacalone*, 853 F.2d 470, 476 (6th Cir. 1988) (stating that a basis for a *Franks* hearing includes repeated stories of a confidential informant with reckless indifference to the truth).  Courts have also held in camera hearings when there was a need to protect a confidential informant whose reliability had not been established in an affidavit.  *See, e.g*., *United States* v. *Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000); *see also Bivens* v. *United States*, 927 F. Supp. 1031, 1034 (E.D. Mich.

1996) (noting that the district court held a *Franks* hearing and an *in-camera* hearing of the confidential information to evaluate the informant's credibility).

## **CONCLUSION**

For the aforementioned reasons, the defendant respectfully requests that the Indictment be dismissed and all evidence resulting from a search of the defendant's personal email account be suppressed.

Dated: July 1, 2025

Respectfully submitted,

*/s/ Robert L. Boone*
Robert L. Boone
Boyd M. Johnson III
Eliot Kim
Emily Gruener

WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6314
robert.boone@wilmerhale.com
boyd.johnson@wilmerhale.com
eliot.kim@wilmerhale.com
emily.gruener@wilmerhale.com

*Attorneys for Defendant Asante Berko*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2025, I electronically filed the above document with the Clerk of the Court using the CM/ECF which will send electronic notification of such filing to all registered counsel.


Dated: July 1, 2025

          */s/ Robert L. Boone*
          Robert L. Boone