

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JPL:JKW/TBM  *271 Cadman Plaza East*
F. #2017R00217  *Brooklyn, New York 11201*

September 19, 2025

By ECF

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Asante Kwaku Berko
                 Criminal Docket No. 20-328 (DG)

Dear Judge Gujarati:

       The government respectfully submits this letter in response to the arguments raised in the defendant Asante Kwaku Berko's letter submitted following oral argument (ECF Dkt. No. 46 ("Br.")) in further support of his motion to dismiss the indictment in the above-captioned case and to suppress evidence resulting from the search of his personal email account (the "Motion") (ECF Dkt. No. 32). As explained below, the defendant's arguments lack merit and are not supported by the law. Accordingly, and for the reasons set forth in the government's opposition brief (ECF Dkt. No. 37 ("Gov't Orig. Br.")), the Motion should be denied in its entirety without an evidentiary or Franks hearing.

    I.    Sealing the Indictment Was Proper While the Defendant Was At Large Overseas

       Pursuant to Federal Rule of Criminal Procedure ("Rule") 6(e)(4), the indictment was appropriately filed under seal because the defendant was at large overseas, and the government wanted to effectuate his arrest before alerting him to the charges due to the defendant's potential flight risk. See Fed. R. Crim. P. 6(e)(4); United States v. Srulowitz, 819 F.2d 37, 40 (2d Cir. 1987) ("[T]here are various legitimate prosecutorial objectives, including, but not limited to, the facilitation of arrest, that will justify the sealing of an indictment."). Indeed, the Indictment Sealing Form stated that "the defendant is currently at liberty overseas," cited the defendant's potential flight risk, and noted the reasonable steps the government anticipated taking to effectuate his arrest. ECF Dkt. No. 3-2. Thereafter, the indictment appropriately remained under seal until the defendant—who remained at large overseas—was arrested pursuant to the government's efforts. This alone was a legitimate and sufficient basis for sealing the indictment and maintaining the indictment under seal.

The Indictment Sealing Form further stated that the government intended to effectuate the defendant's arrest in the coming weeks when he traveled to a country from which he was extraditable, referring to the fact that the government did not believe the defendant was extraditable from Ghana.  As proffered during the hearing, that statement reflected the government's long-held belief that, as a practical matter the defendant was not extraditable from Ghana, given the nature of the charges, the positions of power occupied by the defendant's co-conspirators, and what appeared to be the defendant's significant political connections in Ghana. See Oral Arg. Tr. ("Tr.") 76.  Special Agent Justin McNair's subsequent conversation with the FBI legal attaché confirmed the government's view.  See McNair Aff. ¶ 4.  In any event, irrespective of whether the government intended to seek the defendant's extradition from Ghana or elsewhere at the time the indictment was returned, the indictment was appropriately sealed while the defendant was at liberty overseas, as the magistrate judge found.  See Srulowitz, 819 F.2d at 41 (noting great deference must be accorded to a magistrate judge's decision to seal).

Moreover, the defendant has failed to show "substantial actual prejudice" suffered between the time the indictment was sealed and unsealed, as required to warrant dismissal when the government had a legitimate prosecutorial interest in sealing.  See United States v. Muse, 633 F.2d 1041, 1043-44 (2d Cir. 1980) (en banc) (denying motion to dismiss where indictment was appropriately sealed while government attempted to effectuate arrests and defendant failed to show prejudice); see also Oral Arg. Tr. ("Tr.") 73.  Accordingly, his motion to dismiss must be denied.

## II. The Government Exercised Reasonable Diligence in Locating the Defendant

The government "has a constitutional duty to make a diligent, good faith effort to bring a defendant to trial promptly." United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988). To carry out that affirmative constitutional obligation, the government must pursue the defendant with "reasonable diligence" from his indictment to his arrest.  United States v. Doggett, 505 U.S. 647, 656 (1992).  The government did so in this case.

Diligence "does not require the government to pursue goals that are futile." Blanco, 861 F.2d at 778; United States v. Diacolios, 837 F.2d 79, 83 (2d Cir. 1988) (same).  Nor are the government's efforts unreasonable simply "because other measures would have been more fruitful." United States v. Moreno, 789 F.3d 72, 79 (2d Cir. 2015).  All that is required is that "the government made serious investigative efforts calculated to achieve arrest." Id. at 79-80.  Here, while the defendant's extradition from Ghana was legally possible, it would have been futile to seek his extradition.  Contrary to the defendant's claim, the government's decision not to seek the defendant's extradition from Ghana was well-reasoned and not based on "mere speculation." Br. at 4.[1]  The case team determined, based in part on consultation with the FBI legal attaché within

---

[1] The defendant cites a non-binding district court decision for the principle that the government's decision to forego an extradition request must be "based on substantial evidence," United States v. Khan, 575 F. Supp. 3d 490, 503 (S.D.N.Y. 2021); however, the government is aware of no binding case that imposes a requirement on the government to prove futility through "substantial evidence," much less a case that prescribes the form that evidence must take.  Even if this were the applicable legal standard (it isn't), substantial evidence, summarized below, supports the government's informed decision to forego extradition from Ghana.

2

days of the Indictment, see McNair Aff. ¶ 4, that given the participation of high-ranking Ghanaian government ("GoG") officials—including close family members of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the ▮▮▮▮▮▮▮▮▮▮, and members of Parliament—in the defendant's criminal scheme,[2] providing notice to the GoG presented risks that the defendant would be notified of the Indictment but not arrested. If that occurred, the defendant could flee from justice, including to a jurisdiction that did not have an extradition treaty with the United States. The fact that ▮▮▮▮▮▮▮▮▮▮▮▮ was not in power when the defendant was indicted in August 2020 did not alleviate the government's concerns. In August 2020, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the defendant had only recently resigned from his role running the state-owned Tema Oil Refinery in Ghana. See id. It defies common sense to suggest, as the defendant does, that changes in political influence happen overnight such that the defendant would suddenly have no political connections, particularly, as in this case, where the charges include bribery of officials related to an ongoing project. Common sense indicates that such conduct is unlikely to be confined to a single administration. Against this backdrop,[3] the government made the reasonable and strategic choice not to seek the defendant's extradition from Ghana and instead wait until the defendant traveled to the United States—where he had frequently traveled before sitting for his 2017 interview with the FBI and prosecutors in connection with this case—to the United Kingdom ("U.K.")—where he told prosecutors he split time (with Ghana)—or to virtually any other INTERPOL member country.[4] The defendant was ultimately captured in London, at which time the government timely sought the defendant's extradition from the U.K.

---



[2]    The government respectfully requests leave to seal identifying information concerning third parties and the defendant's co-conspirators in this letter.

[3]    The defendant erroneously asserts that the government justifies its decision not to seek the defendant's extradition from Ghana on the grounds that "it would be challenging" and "present operational risks," Br. at 3, but that mischaracterizes the government's position. The government determined that it was extremely unlikely that the defendant would be extradited from Ghana because of his political connections and chose not to seek his extradition because it would not only tip off the defendant, but also others involved in the bribery scheme that the government was still investigating thereby jeopardizing an ongoing investigation and creating significant risk of the defendant's and/or his co-conspirators' flight from prosecution. See Tr. 44:15-21.

[4]    The defendant has identified no precedential case that holds that the government must explain its reasons for not seeking extradition in an affidavit from a government attorney, nor is the government aware of one. Courts have relied on factual proffers by the government in similar circumstances. See, e.g., United States v. Davis, 598 F. Supp. 453, 456 (S.D.N.Y. 1984) (accepting Assistant United States Attorney's representations that the government reasonably believed its prospects of capturing the defendant were better if the defendant were to travel outside Ireland). Here, in contrast to the cases cited by the defendant in which an affidavit was submitted or testimony provided by the prosecutors, see Br. at 3, n.1, there are already sufficient, undisputed facts available for the Court to find the indictment was appropriately sealed while the defendant was at large overseas, and the government made reasonable efforts to arrest him. To the extent the Court has additional questions about the government's decision to seal the indictment until it

United States v. Davis, 598 F. Supp. 453 (S.D.N.Y. 1984), presents an analogous fact pattern and supports the conclusion that the government is not required to reflexively seek a defendant's extradition in a country where extradition may be legally available. In Davis, the government sealed an indictment that charged two defendants where one of the defendants (Lee) was located in Ireland. Id. at 455. The government sought to capture Lee through assistance of INTERPOL, and specifically waited for him to travel outside Ireland as it believed its "prospects of capturing Lee were better if Lee were to travel outside of Ireland." Id. at 456. The court found that there was a legitimate prosecutorial need for sealing the indictment and credited the government's belief that "if Lee learned that he had been indicted by a grand jury here, he would be more likely to keep to ground in Ireland." Id. (noting that the "accuracy of the Government's assessment appears to be confirmed by the fact that arrangements were ultimately made for Lee's return to the United States from a country other than Ireland"). In a similar vein, this Court should credit the government's belief (based on ample facts) that it would have had a better chance arresting the defendant outside of Ghana.

The defendant's attempts to distinguish Davis are unavailing and premised on a misreading of the case. Specifically, the defendant argues that there was "no dispute that Lee was fleeing the United States to Ireland to avoid capture" and therefore the government in that case, as opposed to this one, had "some basis other than its own 'common sense' – at a minimum, Lee's apparent belief that being in Ireland afforded him some level of protection – to believe that capturing Lee in Ireland might prove challenging." Br. at 4. But, like the defendant, Lee departed the United States for Ireland "before the indictment was filed." Davis, 598 F. Supp. at 455. Just as the defendant argues that the government in Davis could reasonably have believed it would be difficult to capture Lee in Ireland due to "Lee's apparent belief that being in Ireland afforded him some level of protection," the same could be said as to the defendant. Indeed, the defendant required a letter of safe passage to attend a proffer in the United States in 2017, lied to the government during the proffer, returned to Ghana, and then did not voluntarily travel to the United States at any time thereafter, all of which supports the government's reasonable belief that it would have been effectively futile to attempt to capture the defendant in Ghana, a place where he must have felt "some level of protection."

The defendant further argues, wrongly, that the government did not do enough to locate the defendant in the U.K. See Br. at 5; see, e.g., Tr. 69. The government exercised reasonable diligence in locating the defendant, including by obtaining a diffusion notice, creating travel alerts in the United States, and arranging to arrest the defendant at JFK International Airport after the government learned he would be traveling to the United States.[5] The government was not required to undertake every conceivable action to find him. Indeed, the Second Circuit has repeatedly held that law enforcement officials are not expected to make "heroic" or "exhaustive" efforts to apprehend or locate a defendant. United States v. Cabral, 979 F.3d 150, 161 (2d Cir. 2020). All that is required is that law enforcement exercise "reasonable diligence" in locating a defendant. Id. "[I]n assessing the degree of diligence," courts "should not judge law

---

apprehended the defendant and not to seek the defendant's extradition from Ghana, the government remains available to answer them.

[5] The defendant ultimately did not board the flight to JFK.

4

enforcement's actions with the benefit of hindsight, but rather consider the mix of information available at the time and grant 'the day-to-day tactical decisions of law enforcement a measure of deference.'" Id. (citation omitted).

The defendant's reliance on United States v. Leaver, 358 F. Supp. 2d 255 (S.D.N.Y. 2004) is also misplaced. In Leaver, the district court found that the government had not made reasonable efforts to locate the defendant in the U.K. because the government gave U.K. authorities "incomplete and misleading information about Leaver's citizenship"; "failed to inform [them] about the known whereabouts of Leaver's associates"; and never followed-up when the authorities were unable to locate Leaver and asked for "additional information." Id. at 270–71. Here, there is no allegation (much less evidence) that the government provided "incomplete" or "misleading" information about the defendant's whereabouts or failed to assist the U.K. authorities.[6] Contrary to the defendant's suggestion, Leaver does not hold that there are certain affirmative steps the government must take to assist foreign authorities in locating defendants that may or may not be located in those foreign jurisdictions. Indeed, any such holding would be contrary to the above-cited Second Circuit caselaw holding that the tactical decisions of law enforcement are entitled to a measure of deference.

The record thus provides ample facts to demonstrate the government's reasonable diligence in locating the defendant. Accordingly, the Court should deny the motion to dismiss without a hearing.

III. The Warrant Was Supported by Probable Cause

The defendant continues to argue, wrongly, that the affidavit in support of the email search warrant (the "Affidavit") was facially deficient, because according to him it relied exclusively on an unsubstantiated confidential human source ("CHS")[7] to establish probable cause. As demonstrated in the government's opposition brief and at oral argument, the CHS's information was corroborated in a myriad of ways, and even without the CHS's information, the Affidavit furnished probable cause for the search.[8]

---

[6] Further, the government's reasons for not seeking Leaver's extradition from the U.K. are inapposite. In that case, the government took the position that it did not seek Leaver's extradition from the U.K. because of the defendant's "relative unimportance" and because extradition is a "very cumbersome process." Here, the government chose not to seek to extradite the defendant from Ghana because it determined extradition efforts in that country would be futile and had good reason to believe the defendant would be captured elsewhere, as proved true.

[7] While the CHS was not classified in the FBI's system as a "confidential human source" as that term is defined by the policies and procedures of the FBI's Confidential Human Source Program, see ECF Dkt. No. 45, to maintain consistency among the relevant filings in this case and because the individual's identity remains protected, we will continue to use this designation in connection with the Motion.

[8] For the reasons set forth in the government's opposition brief and during oral argument, even assuming the Affidavit lacked probable cause (it did not), suppression is

5

First, the Affidavit provided abundant evidence independent of the CHS that foreign officials were being bribed or promised bribes through an intermediary to facilitate ▮▮▮ ("the Turkish company") efforts to win the power plant bid, which establishes probable cause. See Illinois v. Gates, 462 U.S. 213, 235 (1983) (internal quotation marks omitted) ("[o]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause"); United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) (internal citation omitted) (noting that the analysis of probable cause "is not overly strict," and requires only a "fair probability that contraband or evidence of a crime will be found in a particular place"); United States v. Harding, 273 F. Supp. 2d 411, 417-18 (S.D.N.Y. 2003) (noting probable cause may "be based on an accumulation of circumstantial evidence"); United States v. Bowen, 689 F. Supp. 2d 675, 679–80 (S.D.N.Y. 2010) (stating "common sense" inferences can support a finding of probable cause); see also United States v. Silva, 146 F.4th 183, 189 (2nd Cir. 2025) (reversing district court finding that warrant did not establish probable cause on the basis of information from a confidential informant and evidence found on the defendant's person during his arrest).

The bribery efforts are discussed in a thinly-veiled email, in which ▮▮▮ the Turkish company referenced a $42 million contract with ▮▮▮—the entity connected to the ▮▮▮—and told the defendant and ▮▮▮ that they had to "find a clever way to manage it with the banks. We need to think together with Asante [Berko]." Aff. ¶ 52. Moreover, the defendant lied to ▮▮▮ about the scope of ▮▮▮ involvement. For example, one ▮▮▮ employee described ▮▮▮ as a "local partner" entitled to a share of the revenues, and draft contracts were circulated showing ▮▮▮ earnings tens of millions of dollars. See id. ¶¶ 23–24, 49, 52. Notwithstanding that the defendant was privy to these discussions, see id. ¶ 52, he falsely told ▮▮▮ that ▮▮▮ "did some minor contracting for the" Turkish company but was not a "stakeholder," which the affiant described as an effort to "minimize ▮▮▮ involvement in the power plant deal so as to reduce the deal's appearance of impropriety to [the defendant's] ▮▮▮ colleagues . . . and insulate [the defendant] from scrutiny." Id. ¶ 25. The defendant also mischaracterized the role of ▮▮▮ to ▮▮▮ colleagues, referring to him as a government official, and then describing him as a "local rep" to the Turkish company. Id. ¶ 31. And the defendant used his personal email from some of the discussions, including with ▮▮▮. See id. ¶¶ 39–41. The totality of the circumstances described above, and in the government's opposition brief and at oral argument, reveals the abundant evidence underpinning probable cause even without the CHS's statements.

Second, information provided by the CHS is referenced in only a few paragraphs in the Affidavit (Aff. ¶¶ 16, 17, 18, 19, 31, and 43), and is corroborated by independent evidence. For example, the CHS reported that the defendant had agreed to pay "the Boys" approximately $40 million in exchange for them securing GoG approval for the Turkish company to build the power plant. Id. ¶ 16. Consistent with that report, independent emails reference the assistance of "the Boys" and deals involving approximately $40 million paid to ▮▮▮. See, e.g., id. ¶¶ 45–46, 49, 52. Additionally, the CHS indicated that the defendant's supervisor at ▮▮▮, who he named, knew about the bribery scheme. Aff. ¶ 17. Consistent with that report, a

---

unwarranted because law enforcement relied upon the warrant in good faith. Gov't Orig. Br. at 22–24; Tr. 24–27.

6

employee by the same name asked the defendant for contact information for the ▮▮▮▮ ▮▮▮▮ and stated that he had subsequently been in contact with them related to a proposal with the Turkish company. Id. The CHS reported that in August 2016, the defendant told the CHS he had been reprimanded for getting non-business emails to his ▮▮▮▮ account. Id. ¶ 31. Consistent with that report, in January 2016, a ▮▮▮▮ compliance employee asked Berko about "sending 'email to various Gmail and yahoo accounts,'" in reference to emails from, among others, ▮▮▮▮. Id.

The significant corroboration offered in the Affidavit demonstrated the reliability of the CHS. See United States v. Wagner, 989 F.2d 69, 72–73 (2d Cir. 1993) (holding that information provided by a confidential informant may establish probable cause where it is "sufficiently reliable," which can be established if, inter alia, "it is corroborated in material respects by independent evidence"); United States v. Oztemel, No. 3:23-CR-00026 (KAD), 2024 WL 3090251, at *6 (D. Conn. June 21, 2024) (noting that additional corroborating information "provides the 'indicia of reliability' the issuing magistrate may use when assessing an informant's credibility as part of a probable cause analysis" and also outweighs any impact that omitted material might have had on both source credibility and the existence of probable cause). Because so many of the assertions made by the CHS were substantiated by independent evidence, even information provided by the CHS that finds only circumstantial corroboration—for example, that payments under the ▮▮▮▮ contract were to be used, at least in part, to pay bribes (Aff. ¶ 16); that piles of cash in a coconspirator's office were to be used to bribe government officials, including the ▮▮▮▮ (Aff. ¶ 18); and that a $1 million bribe was to be paid to ▮▮▮▮ ▮▮▮▮ (Aff. ¶ 19)—it was proper for the issuing magistrate judge to credit the statements. See Wagner, 989 F.2d at 73 (stating that corroboration of material aspects of the informant's information is sufficient to warrant crediting the informant's entire account); see also United States v. Steppello, 664 F.3d 359, 365 (2d Cir. 2011) ("an informant who is right about some facts is more likely to be right about others").

Finally, the defendant has utterly failed to satisfy the standard for a Franks hearing—namely, by making a "substantial preliminary showing" that the Affidavit included false statements or omissions that were necessary to establish probable cause and that were the product of the affiant's intentional deception or reckless disregard for the truth. See United States v. Sandalo, 70 F.4th 77, 85 (2d Cir. 2023). The defendant has not and cannot show that omitting the CHS's possible, contingent financial motive from sources other than the relevant criminal authorities here in furnishing information to the government was fatal to probable cause. Even assuming that information had been provided in the Affidavit, it would not have caused a magistrate judge to disregard the CHS's information, particularly in light of the significant corroborative evidence supporting the CHS. Nor can the defendant show that the affiant acted to intentionally mislead or in reckless disregard for the truth. An inference of recklessness is "not to be automatically drawn simply because a reasonable person would have included the omitted information," particularly where "the government comes forward with evidence indicating that the omission resulted from nothing more than negligence." United States v. Rajaratnam, 719 F.3d 139, 154-55 (2d Cir. 2013) (citation omitted). There is no evidence that the affiant intentionally or recklessly sought to hide information from the magistrate that might be important to the determination of probable cause. To the contrary, the Affidavit itself includes potentially

exculpatory information provided by the CHS that the affiant disagreed with based on his independent investigation. See Aff. ¶ 43.

Thus, the motion to suppress the fruits of the search warrant, or in the alternative for a Franks hearing, should be denied.

IV. Conclusion

For the foregoing reasons, the defendant's arguments in further support of his Motion are unavailing and the Motion should be denied in its entirety without a hearing.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ Jessica K. Weigel
Jessica Weigel
Tara McGrath
Assistant U.S. Attorneys
(718) 254-7000

LORINDA I. LARYEA
Acting Chief, Fraud Section, Criminal Division
U.S. Department of Justice

By: /s/ Katherine Nielsen
Katherine Nielsen
Trial Attorney
Katherine Raut
Assistant Chief, FCPA Unit
(202) 616-5672

cc: Clerk of Court (DG) (by ECF)
Counsel of Record (by ECF)